**Wanda J. WILLIAMS, Plaintiff,**

v.

**Carolyn W. COLVIN, Acting Commissioner of Social Security, Defendant.**

**No. 13–CV–6525 EAW.**

United States District Court, W.D. New York.

Signed April 10, 2015.

618

Justin M. Goldstein, Kenneth R. Hiller, Law Offices of Kenneth Hiller, PPLC, Amherst, NY, for Plaintiff.

Kathryn L. Smith, U.S. Attorney's Office, Rochester, NY, Sergei Aden, Social Security Administration, New York, NY, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

## I. INTRODUCTION

Plaintiff Wanda J. Williams ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for disability insurance benefits. (Dkt. 1). Plaintiff alleges that the decision of Administrative Law Judge ("ALJ") John P. Costello was not supported by substantial evidence in the record and was based on erroneous legal standards.

Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 9, 11). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with the applicable legal standards. Thus, the Commissioner's motion for judgment on the pleadings (Dkt. 11) is granted, and

Plaintiff's motion (Dkt. 9) is denied. Plaintiff's complaint is dismissed with prejudice.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Overview

On September 23, 2010, Plaintiff protectively filed an application for disability insurance benefits. (Administrative Transcript (hereinafter "Tr.") 51, 230, 276). In her application, Plaintiff alleged a disability onset date of December 1, 2009. (Tr. 276). Plaintiff had previously applied for social security benefits, and this application was denied on October 19, 2010. (Tr. 231). In her application, Plaintiff alleged the following disabilities: "mental health, depression," high blood pressure, and diabetes. (Tr. 281). On December 7, 2010, the Commissioner denied Plaintiff's application. (Tr. 117–21). Plaintiff requested a hearing by an ALJ on February 7, 2011. (Tr. 51).

On June 11, 2012, Plaintiff, represented by counsel, testified in person at a hearing before ALJ Costello. (Tr. 46–85). Vocational Expert ("VE") Julie Andrews also appeared and testified. (Tr. 86–93). On June 29, 2012, the ALJ issued a finding that Plaintiff was not disabled within the meaning of the Social Security Act. (Dkt. 1–1 at 2–14).

On August 5, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Dkt. 1–2 at 2–5). On September 25, 2013, Plaintiff filed this civil action appealing the final decision of the Commissioner. (Dkt. 1).

### B. The Non–Medical Evidence

On the alleged onset date of December 1, 2009, Plaintiff was a 45–year–old female with a tenth grade education. (Tr. 52, 282). Plaintiff had previous work experi-

ence as a cleaner, packager, and house-keeper. (Tr. 52, 283, 290–94).

At the time of her hearing, Plaintiff alleged disability due to diabetes mellitus Type II, bilateral carpal tunnel, stomach problems, and mental health issues. (Tr. 52–54).

### 1. Plaintiff's Testimony

Plaintiff testified that she was single and lived with her three children. (Tr. 55). Her most recent job was a cleaner at a nursing home, where she washed and folded laundry. (Tr. 55–57). Plaintiff stopped working there after she "tore something in [her] elbow" lifting a bag and required surgery. (Tr. 57–58). Plaintiff stated that she no longer had trouble with her elbow, although sometimes it would become stiff. (Tr. 68).

Plaintiff testified that her most serious health problem was her "hand problem." (Tr. 63). Plaintiff stated that she had cut the tendons in her right hand approximately 20 years before the hearing, and that she had limited movement in her hand as a result. (Tr. 63–64). The ALJ asked Plaintiff to make a fist, and noted that she was unable to touch her fingertips to the palm of her hand, although she could flex her thumb "pretty well." (Tr. 65). Plaintiff said that she was right-handed and could write with her hand, but held things in her left hand because of pain and lack of flexibility in her right hand. (Tr. 67).

Plaintiff also said that she suffered stomach pains and that the doctors had prescribed medication and told her not to eat spicy foods, but that her pain persisted. (Tr. 69). When Plaintiff felt this pain, she claimed that she had to "stay still" until it stopped. (Tr. 70).

Plaintiff further indicated that she was on medication because her legs swelled up at night. (Tr. 71). This was a recent development, but it interfered with Plain-tiff's ability to get up to use the restroom at night. (Tr. 72).

Plaintiff stated that she had trouble focusing and could not be around "a lot of people" without becoming nervous. (Tr. 74). She was taking Prozac to help with this anxiety. (Tr. 75). Plaintiff had been treating with two therapists at "Jordan Health Center" twice per month for approximately three months. (Tr. 76–77). She was unable to attend group therapy because when she tried to attend a group session, she became "hot and sweaty" and had to leave the room. (Tr. 84).

Plaintiff testified that she could stand for approximately one half hour before needing to sit, and could lift "about 15 pounds," but had no problems sitting or walking. (Tr. 73). She could wash some dishes, do laundry with her left hand, and vacuum, but she could not sweep because she was not able to use her right hand. (Tr. 80). She would shop for groceries with her daughters because she did not have a license and could not drive. (Tr. 81).

The ALJ also asked Plaintiff about her diabetes and high blood pressure, and Plaintiff testified that she was on medication for these issues. (Tr. 82–83).

### 2. Vocational Expert Testimony

The ALJ presented VE Julie Andrews with a hypothetical question. (Tr. 87–91). The VE was asked to consider someone of Plaintiff's age, education, and experience who could perform the full range of medium work with additional limitations to frequent fingering and handling, simple tasks, and only occasional interaction with co-workers and the general public. (Tr. 87). The VE responded that the hypothetical individual could perform Plaintiff's past work as a laundry worker, and could also perform the representative jobs of industrial cleaner or housekeeper. (Tr. 88–89).

The ALJ posed a second hypothetical to the VE placing the same additional restrictions to an individual capable of light, as compared to medium, work. (Tr. 89). The VE responded that such an individual would be unable to perform claimant's past work, but could perform the representative positions of housekeeper or agricultural sorter. (*Id.*).

In a third hypothetical, the VE was asked to consider the same individual from the second hypothetical with the additional restriction of occasional fingering and handling with the dominant hand. (*Id.*). The VE stated that such an individual could work as a housekeeper or mail clerk, but not an agricultural sorter. (Tr. 89–90).

### C. Summary of the Medical Evidence

The Court assumes the parties' familiarity with the medical record, which is summarized below.

#### 1. Physical Condition

##### a. Prior to Plaintiff's September 23, 2010 Application Date

On July 28, 2008, Plaintiff presented to the emergency department for complaints of left elbow pain that began when she "turned the wrong way" while carrying laundry baskets at work. (Tr. 509–10). An examination showed normal findings and full range of motion in the elbow joint. (Tr. 509). Plaintiff was prescribed Vicodin for pain. (*Id.*).

On June 5, 2009, Plaintiff presented to the emergency room for complaints of "sharp" abdominal pain. (Tr. 493–97). A computed tomography ("CT") scan of Plaintiff's abdomen showed "no radiographic evidence of inflammation." (Tr. 496).

On June 8, 2009, Plaintiff visited Nurse Practitioner ("NP") Mary Angerame at Anthony L. Jordan Health Center ("Jordan"), following up for complaints of abdominal pain. (Tr. 357–58). NP Angerame gave Plaintiff a Ketoralac injection, a prescription for Nexium, and an order for laboratory testing. (*Id.*). When Plaintiff returned the next day, Plaintiff reported that her pain had resolved. (Tr. 356). The laboratory results were positive for a helicobacter pylori infection, and NP Angerame prescribed medication. (Tr. 355).

On September 17, 2009, Plaintiff returned to Jordan to treat with Dr. Richard Kennedy concerning her diabetes mellitus. (Tr. 353–54). Dr. Kennedy noted that Plaintiff had a previous elbow injury that was treated through surgery by Dr. Tomiano, and that Dr. Tomiano had cleared Plaintiff to return to work. (Tr. 353). Dr. Kennedy diagnosed diabetes mellitus type II, hypertension, gastroesophageal reflux disease ("GERD"), and essential hypertriglyceridemia. (Tr. 353–54).

Plaintiff returned to the emergency department on December 29, 2009, for complaints of abdominal pain, diarrhea, nausea, and vomiting. (Tr. 501–07). Laboratory results and a CT showed stable hepatomegaly and atherosclerotic disease. (Tr. 502–03). Plaintiff was discharged with medication. (Tr. 502, 506–07).

On March 18, 2010, Plaintiff visited NP Elissa Hughes at Jordan, complaining of carpal tunnel in her left wrist with pain on movement. (Tr. 334). Plaintiff reported wrist pain at an intensity of 8 out of 10. (*Id.*). Ms. Hughes prescribed Levofloxacin and Etodolac to treat the carpal tunnel syndrome. (Tr. 335).

Plaintiff returned to the emergency department on April 21, 2010, complaining of abdominal pain. (Tr. 605–07). Plaintiff was discharged with a prescription for Bentyl. (Tr. 606–07).

On April 29, 2010, Plaintiff returned to the emergency department with com-

plaints of shortness of breath and abdominal pain. (Tr. 608–14). An examination was normal, and Plaintiff was given Ativan and Morphine. (Tr. 614). Plaintiff was discharged with instructions to follow up with her doctor. (*Id.*). The next day, Plaintiff followed up with NP Angerame, who assessed pelvic inflammatory disease, administered injections, and prescribed Flagyl, Ceftriaxone, Azithromycin, Kerorolac Tromethamine, and Phenergen. (Tr. 337–38).

On May 6, 2010, Dr. Samuel Balderman performed a consultative internal medicine examination. (Tr. 520–53). Plaintiff reported that she could cook, clean, bathe, and dress herself. (Tr. 521). Dr. Balderman noted after an examination that Plaintiff's hand and finger dexterity was reduced in her right hand. (Tr. 522). Plaintiff had mild limitations in "zipping zippers or buttoning buttons". (*Id.*). Grip strength in the right hand was four out of five. (*Id.*). Dr. Balderman diagnosed diabetes, hypertension, and status post laceration involving the right hand. (*Id.*). Dr. Balderman opined that Plaintiff had "[m]ild limitation in the use of the right hand for fine and gross motor work." (*Id.*).

Plaintiff returned to the emergency department on May 14, 2010, for abdominal pain. (Tr. 615–17). Plaintiff was prescribed Norco and Zofran and was directed to follow up with her physician and a gastrointestinal doctor. (Tr. 617). Plaintiff followed up with Dr. Kennedy on May 19, 2010. (Tr. 331). Plaintiff reported lower back pain aggravated by movement, bending, and twisting. (Tr. 332). Dr. Kennedy diagnosed generalized abdominal pain and diabetes mellitus type II. (Tr. 333). He prescribed Levsin, Nexium, Vicodin, and Phenergan. (*Id.*).

Plaintiff received an endoscopy and stomach biopsy on May 28, 2010. (Tr. 705). These tests showed "mild non-specific chronic gastritis." (*Id.*). A colonoscopy and rectum biopsy on June 3, 2010, showed a tubular adenoma. (Tr. 704).

On June 28, 2010, gastroenterologist Dr. Jeffrey A. Goldstein wrote Dr. Kennedy, stating that Plaintiff did not attend four scheduled appointments. (Tr. 911). Dr. Goldstein noted that Plaintiff had a rectal polyp notable for tubular adenoma removed. (*Id.*). He also noted that Plaintiff had nonspecific gastritis, and recommended Plaintiff continue proton pump inhibitor therapy. (*Id.*).

On June 29, 2010, Plaintiff followed up with Dr. Kennedy concerning her abdominal pain and cramping. (Tr. 683). Dr. Kennedy noted that Plaintiff's abdominal pain "sound[ed] like" irritable bowel syndrome ("IBS"), and added Metamucil powder to Plaintiff's medications. (Tr. 685).

On September 1, 2010, Plaintiff informed Dr. Kennedy that the medication was not helping her abdominal pain and that she had daily cramping pain. (Tr. 681). Dr. Kennedy noted that Plaintiff may have an issue in the pelvic area and recommended an ultrasound and gynecological examination. (Tr. 683).

**b. Following Plaintiff's September 23, 2010 Application Date**

Plaintiff's September 28, 2010 ultrasound was "unremarkable." (Tr. 710).

On September 28, 2010, Plaintiff presented to the emergency department complaining of "flank" pain and nausea. (Tr. 619). Plaintiff's examination was normal, with no identified cause for the abdominal pain. (Tr. 620). Plaintiff was given a Toradol injection and was discharged. (*Id.*).

Plaintiff followed up with Dr. Kennedy on November 11, 2010. (Tr. 678). Plaintiff denied that her pain limited her activi-

ties. (Tr. 680). Dr. Kennedy diagnosed pelvic pain, dysmenorrhea, and abdominal pain. (*Id.*). He increased Plaintiff's dosage of Hydrocodone and recommended a gynecological examination. (*Id.*).

On November 16, 2010, Dr. Harbinder Toor conducted a consultative internal medical examination. (Tr. 408–11). Dr. Toor observed that Plaintiff had a "slight difficulty" in changing for the examination due to pain in her right elbow, lower arm, and hand. (Tr. 409). Plaintiff demonstrated a restriction in movement of her right wrist with pain in the right wrist. (Tr. 410). Grip strength was 3 out of 5 in Plaintiff's right hand, and 4 out of 5 in her left hand. (*Id.*). Dr. Toor diagnosed a history of: (1) carpal tunnel syndrome with pain in the hands, more severe in the right than the left; (2) pain in the right elbow/right lower arm; (3) diabetes; (4) hypertension; and (5) depression. (Tr. 411). Dr. Toor opined that Plaintiff had "moderate limitation pushing, pulling, lifting, grasping, holding, writing, tying shoes, zipping zippers, buttoning buttons, picking up coins, manipulating coins, or holding a pen with the right hand." (*Id.*). Further, Plaintiff had a "mild limitation with the left hand for grasping and holding." (*Id.*).

Plaintiff visited NP Joanna M. Aghaie at Jordan on November 30, 2010, for complaints of cramping abdominal pain. (Tr. 675–77). Plaintiff reported that the pain limited her activities, but that prescription medication helped the pain. (Tr. 676). The gynecological examination was normal, but NP Aghaie prescribed Bactrim DS and Pyridium, and ordered laboratory testing. (Tr. 677).

The CT scan of Plaintiff's pelvis on December 20, 2010, was negative and "unremarkable." (Tr. 709).

On February 21, 2011, Plaintiff treated with Dr. Kennedy complaining of abdominal pain, but reporting that the pain did not interfere with her activities. (Tr. 665–667). Dr. Kennedy referred Plaintiff to Dr. Goldstein and recommended laboratory testing to rule out gluten sensitive enteropathy. (Tr. 667). Dr. Kennedy added Gabapentin and Pantoprazole to Plaintiff's medications. (*Id.*).

On March 21, 2011, Dr. Goldstein ordered an endoscopy and biopsy. (Tr. 909). These tests were performed on March 25, 2011, and revealed the following diagnostic impressions: (1) rule out gastritis, antritis, and Helicobacter pylori; and (2) hiatal hernia. (Tr. 947).

On March 29, 2011, Plaintiff requested that PA Camille Good provide her with more pain medications for her abdominal symptoms. (Tr. 662–64). PA Good stated that Plaintiff would need a urine drug screen, and Plaintiff refused. (Tr. 663).

On April 5, 2011, PA Good noted that Plaintiff's gastric biopsy showed no pathology. (Tr. 660).

On April 26, 2011, Plaintiff visited PA Good, reporting chronic abdominal pain and occasional leg numbness when she got out of bed, although Plaintiff reported that she did "a lot of walking." (Tr. 653).

On June 14, 2011, PA Good noted that all of the examinations for Plaintiff's stomach pain complaints had been negative. (Tr. 650). Plaintiff claimed the Gabapentin provided some relief for her leg pain. (*Id.*). PA Good was "hesitant" to increase Plaintiff's dosage of narcotic medications without a diagnosis, so she referred Plaintiff for another gynecological examination. (Tr. 651).

Plaintiff visited Dr. Kennedy on June 28, 2011, complaining of stomach and leg pain. (Tr. 645–49). Dr. Kennedy referred Plaintiff for a neurological evaluation to examine her leg complaints, and also referred Plaintiff to Dr. Goldstein. (*Id.*). He fur-

ther noted that Plaintiff was unhappy with her mental health treatment at EBHC, and indicated that he would refer Plaintiff to Jordan. (*Id.*).

On August 19, 2011, a CT scan of Plaintiff's abdomen and pelvis as well as an ultrasound showed "minimal prominence of the common bile duct," with no other abnormalities. (Tr. 706–08). On August 25, 2011, Dr. Kennedy noted that this slight dilation of the common bile duct did not correlate with Plaintiff's pain symptoms. (Tr. 643). Dr. Goldstein also reviewed Plaintiff's test results and recommended a magnetic resonance cholangiopancreatography ("MRCP") and liver function tests ("LFTs"). (Tr. 908).

A September 9, 2011 MRCP of Plaintiff's abdomen showed stable hepatomegaly, slightly enlarged common hepatic and common bile ducts, and no focal or acute lesions. (Tr. 954). Dr. Goldstein reviewed the results of the MRCP and noted that Plaintiff's LFTs were normal. (Tr. 906). Plaintiff reported that she was feeling better. (*Id.*). Dr. Goldstein stated that he would order no further tests because Plaintiff's recent MRCP and LFTs were normal. (*Id.*).

On September 22, 2011, Plaintiff visited with Dr. Kennedy, complaining of swelling in her left thumb, tingling of the second to third fingers, abdominal pain, and ankle pain. (Tr. 637). Plaintiff stated that she could not walk without pain. (*Id.*). On examination, Plaintiff had "fairly diffuse" tenderness in her abdomen, and there was nodular swelling in Plaintiff's thumb. (Tr. 638–39). Dr. Kennedy referred Plaintiff for a gynecological evaluation to consider if Plaintiff's abdominal complaints may be endometriosis. (Tr. 639). A gynecological examination on April 10, 2012, showed no significant developments. (Tr. 913–15).

On November 21, 2011, Dr. Kennedy reported that Plaintiff's thumb swelling had resolved. (Tr. 629). He assessed hypertension and abdominal pain, and prescribed Atenolol and Vicodin. (Tr. 630).

On December 14, 2011, Dr. Nashat S. Atalla treated Plaintiff for continued stomach pains. (Tr. 625–28). Dr. Atalla assessed hypertension, folliculitis, and generalized abdominal pain. (Tr. 627). Dr. Atalla instructed Plaintiff to hold off on taking medications that may cause abdominal pain to see if the pain would improve, and prescribed Bacitracin ointment. (*Id.*).

On March 22, 2012, Plaintiff visited NP Angerame complaining of leg pain and swelling. (Tr. 933, 936). NP Angerame noted that Plaintiff had not returned to her GI doctor as suggested. (Tr. 933).

On April 9, 2012, Dr. Goldstein recommended an updated endoscopy and laboratory testing. (Tr. 905).

On April 10, 2012, NP Donna Barton assessed mennorhagia, enlarged uterus, and pelvic pain. (Tr. 915). NP Angerame also treated Plaintiff on this date for pain in the feet and toes that worsened with standing and walking. (Tr. 928–32). NP Angerame assessed differential diagnosis of diabetic neuropathy, rheumatologic disorder, or other neuropathy related to alcohol. (Tr. 931).

On April 16, 2012, Plaintiff underwent an endoscopy and biopsy that revealed no significant pathological findings. (Tr. 946, 952).

### 2. Mental Conditions

#### a. Prior to Plaintiff's September 23, 2010 Application Date

On December 3, 2009, NP Angerame treated Plaintiff for depression, as Plaintiff had recently called the mobile crisis lifeline. (Tr. 470). NP Angerame assessed depression, diabetes mellitus type II, and hypertension. (*Id.*). She prescribed Lexapro for depression. (Tr. 471). She noted

that Plaintiff had a scheduled appointment at Evelyn Brandon Health Center Mental Health ("EBHC").

Plaintiff first treated at EBHC on December 9, 2009. (Tr. 388). Keith Wilson, LMHC completed a mental health evaluation. (Tr. 388–94). Plaintiff reported that she had been isolating herself, and had recently experienced a panic attack when she attempted to attend a class of 30 people. (Tr. 389). Mr. Wilson assessed Plaintiff with PTSD and noted that Plaintiff experienced severe depression. (*Id.*). Plaintiff admitted that she used cocaine every couple of days. (Tr. 391). Plaintiff exhibited disorganized thought form with helplessness and worthlessness in her thought process. (Tr. 392). Plaintiff expressed an anxious and depressed mood, and her affect was anxious. (*Id.*). She showed superficial insight and poor concentration. (*Id.*).

On January 4, 2010, Andrea Fedoruk, LCSW–R of EBHC completed a comprehensive evaluation. (Tr. 379–87). Plaintiff reported insomnia, decreased interest, decreased energy level, decreased concentration, and a fair appetite. (Tr. 380). Plaintiff had an anxious and depressed mood, with thoughts of worthlessness. (Tr. 385). She had poor concentration and superficial insight. (*Id.*). Ms. Fedoruk noted the following diagnoses: (1) alcohol dependence; (2) nicotine dependence; (3) cocaine dependence; (4) depressive disorder not otherwise specified; (5) posttraumatic stress disorder; and (6) diabetes, high blood pressure. (Tr. 379).

On January 18, 2010, Plaintiff visited Ms. Fedoruk for individual therapy. (Tr. 452). Plaintiff's mental status was largely unremarkable, although Plaintiff demonstrated a constricted affect and memory impairment for remote events. (Tr. 453).

Plaintiff visited Ms. Fedoruk on March 16, 2010, for individual therapy. (Tr. 444).

Plaintiff's motor movements were lethargic, her mood and affect were depressed, and she appeared preoccupied. (Tr. 445).

On March 31, 2010, Ms. Fedoruk noted that Plaintiff indicated she was "feeling better" and made short term goals to increase her activity level. (Tr. 442). Plaintiff's mental status was mostly unremarkable. (Tr. 443).

On April 18, 2010, Ms. Fedoruk noted that Plaintiff appeared alert and demonstrated good judgment. (Tr. 760–61).

On April 30, 2010, Ms. Fedoruk reported that Plaintiff did not want to discuss anything but her "current symptoms of physical illness." (Tr. 764). Plaintiff had an anxious mood and a constricted affect. (Tr. 765).

On May 6, 2010, consultative examining psychologist Dr. Maryanne G. Hamilton evaluated Plaintiff. (Tr. 516–19). Plaintiff reported difficulty falling asleep and a loss of appetite with a history of depression. (Tr. 516). Plaintiff claimed that she worried "excessively," was restless, had difficulty concentrating, and had muscle tension. (*Id.*). Plaintiff reported a fear of crowds, occasional panic attacks, and hearing "whispers" and seeing "shadows" when at home alone. (Tr. 517). Plaintiff reported that she occasionally drank but had never used illegal drugs. (*Id.*). On examination, Plaintiff appeared "irritable." (Tr. 517). Her though processes were "somewhat confused," and her attention and concentration were "impaired due to depression." (*Id.*). Dr. Hamilton opined that Plaintiff could follow simple instructions and directions and could perform simple tasks. (Tr. 518). However, Plaintiff was unable to maintain attention, maintain a regular schedule, learn new tasks, perform complex tasks, make appropriate decisions, relate adequately with others, or deal appropriately with stress as a result of her

depression. (*Id.*). Dr. Hamilton diagnosed major depressive disorder, anxiety disorder, hypertension, and diabetes. (*Id.*).

State psychiatric consultant Dr. M. Apacible reviewed Plaintiff's records on May 18, 2010. (Tr. 524–44). Dr. Apacible determined that Plaintiff had mild restrictions in activities of daily living as well as mild difficulties maintaining social functioning. (Tr. 534). Plaintiff had moderate difficulties maintaining concentration, persistence, or pace. (*Id.*). Dr. Apacible noted Plaintiff's conflicting reports with respect to her drug and alcohol use as well as the fact that most of Plaintiff's mental health reports were unremarkable. (Tr. 543). Dr. Apacible opined that Plaintiff's allegations were credible, but not to the degree alleged. (*Id.*).

On May 21, 2010, Ms. Fedoruk informed Plaintiff that she was planning to retire. (Tr. 767). Plaintiff appeared tired and worried, and had an anxious mood and affect. (Tr. 768)..

On May 28, 2010, Kevin M. McIntyre, M.D. of EBHC completed a psychiatric evaluation of Plaintiff. (Tr. 395–402). Plaintiff reported alcohol and cocaine use but did "not seem to see her use as a problem." (Tr. 396). Plaintiff reported hearing "whispers" and experiencing nightmares. (Tr. 395–96). Dr. McIntyre noted that Plaintiff had a suspicious thought process that seemed to be connected to anxiety as compared to psychosis. (Tr. 400). Plaintiff demonstrated an anxious mood and "perhaps constricted, perhaps guarded" affect. (*Id.*). Dr. McIntyre increased Plaintiff's dosage of Lexapro and also prescribed trazodone. (Tr. 401).

On June 22, 2010, Ms. Fedoruk talked to Plaintiff about transitioning to her new therapist. (Tr. 784). Plaintiff exhibited a depressed mood and affect. (Tr. 785).

Dr. McIntyre treated Plaintiff on June 24, 2010, and noted that Plaintiff had a depressed and sad mood with a constricted affect. (Tr. 581). Dr. McIntyre directed Plaintiff to taper and discontinue Lexapro, he prescribed Wellbutrin, and continued trazodone. (Tr. 581).

On July 20, 2010, Plaintiff had her first session with Emily Rein, MS, MHC, of EBHC. (Tr. 791–94). Plaintiff displayed helplessness and hopelessness, and had a depressed mood. (Tr. 792).

On September 16, 2010, Plaintiff visited Ms. Rein, complaining of difficulty sleeping. (Tr. 806). Ms. Rein noted that Plaintiff had a "persistent depressed mood and anxiety, most recently complicated by process of bereavement." (Tr. 807).

### b. Following Plaintiff's September 23, 2010 Application Date

Plaintiff visited Dr. McIntyre on October 12, 2010, and stated that she was taking the Wellbutrin as prescribed, but was experiencing dizziness. (Tr. 577). Plaintiff reported that she had not taken cocaine in "a couple of months." (Tr. 578). Dr. McIntyre directed Plaintiff to taper the Wellbutrin and prescribed Remeron. (Tr. 579). Plaintiff had a depressed mood, restricted affect, and thoughts of helplessness. (*Id.*).

On November 11, 2010, Plaintiff treated with Ms. Rein and reported a slight improvement in her mood and sleep. (Tr. 813). Plaintiff stated that she was experiencing pain in her arm and abdomen. (*Id.*). Plaintiff exhibited logical and coherent thought form and no apparent cognitive deficit, although she expressed sadness and loneliness. (Tr. 814).

On November 16, 2010, consultative examining psychologist Dr. Adele Jones evaluated Plaintiff. (Tr. 434–38). Plaintiff reported difficulty sleeping and loss of

appetite. (Tr. 435). Plaintiff alleged various symptoms of depression as well as hearing whispers and seeing shadows. (*Id.*). Plaintiff reported drinking approximately every four days and denied any history of illicit substance abuse. (*Id.*). Dr. Jones noted a restricted affect and dysthymic mood. (Tr. 436). Plaintiff was mildly impaired in her attention and concentration as well as her recent and remote memory skills. (*Id.*). Plaintiff reported "having some problems with her arms," but informed Dr. Jones that she could dress, bathe, and groom herself. (*Id.*). Plaintiff also stated that she could cook, clean, launder, shop, manage money, and take public transportation. (Tr. 436–37). Dr. Jones opined that Plaintiff could follow and understand simple directions, perform simple and complex tasks independently, maintain a regular schedule, learn new tasks, make appropriate decisions, and appropriately deal with stress. (Tr. 437). Dr. Jones noted "chronic problems maintaining attention and concentration, possibly due to ADHD," and further opined that Plaintiff could not relate adequately with others due to a history of abuse. (*Id.*). Dr. Jones diagnosed major depressive disorder, posttraumatic stress disorder, rule out alcohol abuse, rule out attention deficit hyperactivity disorder, diabetes, and high blood pressure. (*Id.*).

State psychiatric consultant Dr. R. Altmansberger reviewed the available evidence on November 30, 2010, and noted that Plaintiff had a history of substance abuse, depression, and PTSD. (Tr. 428). Dr. Altmansberger questioned Plaintiff's credibility as a result of her differing reports with respect to alcohol and drug use. (*Id.*). Dr. Altmansberger concluded that Plaintiff retained the ability to perform unskilled work. (*Id.*).

On January 13, 2011, Ms. Rein noted that Plaintiff had missed a few appointments due to illness. (Tr. 824). Plaintiff indicated that she was concerned about a surgery scheduled for her right arm for the end of the month. (*Id.*). Plaintiff had good insight and good judgment, although she expressed an anxious and sad mood. (Tr. 825).

Plaintiff informed Ms. Rein on February 15, 2011, that she had the surgery on her arm and was recovering and going to physical therapy. (Tr. 827). Plaintiff reported that her medication made her too drowsy. (*Id.*). Ms. Rein noted that Plaintiff had "mild depression, possibly with some intellectual delay or at very least a limited insight into self such that it appears she does not always understand what writer is communicating." (Tr. 828).

On March 3, 2011, Plaintiff informed Ms. Rein that she had a desire to work but did not "feel ready" at that time. (Tr. 829). Plaintiff had no apparent cognitive deficit but expressed thoughts of guilt and worthlessness. (Tr. 830).

On March 8, 2011, Plaintiff told Dr. McIntyre that her mood was "ok" and that her appetite was "not too good" but that she was "eating enough." (Tr. 572). Plaintiff claimed that the Remeron was too sedating, so she elected to take a half pill until it ran out. (*Id.*). Plaintiff reported having the flu and an elbow surgery that caused her to miss earlier appointments. (Tr. 573). Dr. McIntyre reported that Plaintiff's mental status was largely unremarkable. (*Id.*).

Plaintiff visited Ms. Rein on April 6, 2011. (Tr. 842–43). She expressed a depressed mood and flat affect, with thoughts of helplessness, hopelessness, and worthlessness. (Tr. 843).

On May 18, 2011, Plaintiff completed an individual therapy session with Wanda Ewer, LMSW, at EBHC. (Tr. 845–51). Plaintiff indicated that she required a

morning appointment because she stayed in her bed in the afternoon and could only leave her bed to go out in the morning. (Tr. 845). Plaintiff was "adamant" that she would not participate in group sessions. (Tr. 846).

On August 9, 2011, Plaintiff informed Dr. McIntyre that she would go to the store and back but otherwise did not "get out as much." (Tr. 570). Plaintiff had a depressed mood and constricted affect, but otherwise had an unremarkable mental status. (*Id.*).

On August 31, 2011, Plaintiff treated with Emily Stanton, MSW, of EBHC (Tr. 869–72). Ms. Stanton noted that Plaintiff was picking at the skin on her face, rubbing her hands on her pants, and having quick body movements during the session, and expressed a concern that Plaintiff had engaged in cocaine use. (Tr. 869).

Plaintiff visited Ms. Stanton on October 5, 2011, and demonstrated a reluctance to take a urine test. (Tr. 564).

On October 20, 2011, Ms. Stanton noted that Plaintiff did not comply with getting an evaluation from chemical dependency. (Tr. 560). Plaintiff appeared irritable, moved in her seat frequently, and had a lack of eye contact. (*Id.*). Plaintiff refused to take a urine test. (*Id.*).

On December 6, 2011, Dr. McIntyre noted that Plaintiff appeared "a little fidgety but not as much as in the past," and he noted a depressed mood and constricted affect. (Tr. 555).

On January 9, 2012, Jessica Jordan, LCSW, of EBHC drafted a case note that Plaintiff called to complain about multiple therapist changes. (Tr. 897). Plaintiff was "also angry at therapist who put on dss paperwork she can work. [S]ays she doesn't want to work, wants to see a therapist instead." (*Id.*). Ms. Jordan reported that she informed Plaintiff she could work

and see a therapist, and Plaintiff said that she would not wait for another therapist because she needed to have a medical statement completed. (*Id.*).

On January 12, 2012, Jessica Jordan of EBHC completed a discharge summary per Plaintiff's request to close her case to transfer mental health treatment to another provider. (Tr. 898–903).

Plaintiff's mental health treatment transferred to Scott Grefrath, LCSW–R, of Jordan, on February 9, 2012. (Tr. 942–44). Plaintiff reported that she was cleared to go back to work but had not gone back to work. (Tr. 942). Plaintiff stated that "DSS" was requiring her to start a program but she was refusing because it involved being in a group of 15 people. (*Id.*). Plaintiff's mental status exam was within normal limits, although Plaintiff had a depressed mood. (Tr. 943). Mr. Grefrath assessed depression, alcohol dependence, cocaine dependence, and rule out "PTSD vs. Anxiety." (Tr. 943).

On February 24, 2012, Plaintiff visited Mr. Grefrath, complaining of lack of sleep and "clashing" with her daughter. (Tr. 940). Plaintiff reported feeling depressed and anxious about attending a chemical dependence group as mandated by "DHS." (*Id.*). Plaintiff expressed racing and disorganized thoughts and a depressed mood, but otherwise her mental status was within normal limits. (*Id.*).

On April 11, 2012, Plaintiff discussed with Mr. Grefrath her disappointment that her prior therapist Ms. Stanton had opined that Plaintiff could work. (Tr. 938). Plaintiff stated that she felt she could not work. (*Id.*). Mr. Grefrath noted that Plaintiff's "best bet at this point would be asking her medical team if she can be excused due to her physical issues." (Tr. 939).

On April 26, 2012, NP Barbara Melder, of Jordan examined Plaintiff and assessed depressive disorder, and "probable alcohol dependence," and stated "most likely alcoholic although she denies it. . . ." (Tr. 965). Plaintiff reported trouble falling asleep and staying asleep, and had a depressed mood. (*Id.*).

### D. Determining Disability Under the Social Security Act

The Social Security Act provides that a claimant will be deemed to be disabled "if [s]he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v. Colvin*, No. 13–CV–638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The burden is on the claimant to demonstrate that she is disabled within the meaning of the Act. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir.2002). The individual will only be declared disabled if her impairment is of such severity that she is unable to do her previous work and cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination at any step, the evaluation will not continue to the next step. 20 C.F.R.

§ 416.920(a)(4). The following five steps are followed:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir.2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

### III. DISCUSSION

#### A. Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, the Court may 'enter, upon

the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing.'" *Emerson v. Comm'r of Soc. Sec.,* No. 12 Civ. 6451(PAC)(SN), 2014 WL 1265918, at *9 (S.D.N.Y. Mar. 27, 2014) (quoting 42 U.S.C. § 405(g)). 42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987).

Therefore, the scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating the plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence in the record. *See Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983) (stating that a reviewing Court does not examine a benefits case *de novo* ). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater,* 77 F.3d 41, 46–47 (2d Cir.1996).

Judgment on the pleadings may be granted under Rule 12(c) where the "mate-rial facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988).

### B. Analysis of ALJ's Determination

#### 1. Step One

In applying the five-step sequential analysis at the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 23, 2010, the date of her application. (Dkt. 1–1 at 7). The parties do not contest this determination and it is supported by substantial evidence.

#### 2. Step Two

At the second step, the ALJ found that Plaintiff had the following severe impairments: depression, anxiety, a history of alcohol and cocaine abuse, and foot and leg pain. (Dkt. 1–1 at 7).

Plaintiff contends that ALJ Costello erred when he failed to find that her carpal tunnel syndrome was a severe impairment at step two of his analysis. (Dkt. 9–1 at 17–21). Plaintiff also argues that ALJ Costello was required to further develop the record with respect to this impairment and that his failure to develop the record constituted reversible error. (*Id.*). The Commissioner argues that the ALJ had sufficient evidence to properly evaluate Plaintiff's hand condition. (Dkt. 11 at 28–32).

As an initial matter, the fact that ALJ Costello did not find Plaintiff's carpal tunnel syndrome to be a severe impairment at step two of his analysis does not create reversible error in light of the fact that he did consider Plaintiff's elbow and wrist pain in formulating his RFC at steps three and four of the analysis. (Dkt. 1–1 at 11). "Because Step Two merely serves

as a filter to screen out *de minimis* disability claims, a finding of any severe impairment, whether attributable to a single condition or a combination of conditions, is enough to satisfy its requirements." *Kessler v. Colvin*, 48 F.Supp.3d 578, 593 (S.D.N.Y.2014); *see also Cook v. Astrue*, No. 08–CV–1351 TJM/VEB, 2011 WL 2490996, at *4 (N.D.N.Y. May 24, 2011) *report & recommendation adopted*, No. 08–CV–1351, 2011 WL 2471300 (N.D.N.Y. June 22, 2011) ("Moreover, because the ALJ concluded that Plaintiff had other impairments considered severe under the Act (*i.e.*, major depression, social/generalized anxiety, and obsessive compulsive disorder) and continued with the sequential analysis, any arguable error in his finding with respect to the severity of Plaintiff's PTSD was harmless."); *Fortier v. Astrue*, No. 3:10cv01688(MRK)(WIG), 2012 WL 3727178, at *9 (D.Conn. May 11, 2012) ("[B]ecause the ALJ found at least one impairment to be severe and continued to step three in the sequential evaluation process, her failure to recognize all of Plaintiff's severe impairments was harmless error.").

In addition, to the extent Plaintiff argues that the ALJ was required to develop the record further with respect to her alleged treatment for carpal tunnel syndrome, this argument also fails.

■ "Although the claimant has the general burden of proving that he or she has a disability within the meaning of the Act, because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Ubiles v. Astrue*, No. 11–CV–6340T(MAT), 2012 WL 2572772, at *7 (W.D.N.Y. July 2, 2012) (internal quotations omitted). "[A]n ALJ may not rely, as factfinders in adversarial proceedings customarily do, on the *absence* of probative evidence supporting the opinions of a claimant's expert, without making an affirmative effort to fill any gaps in the record before him." *Thomas v. Barnhart*, No. 01 Civ. 518(GEL), 2002 WL 31433606, at *4 (S.D.N.Y. Oct. 30, 2002) (emphasis in original). "In fact, where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.1999). "Ultimately, 'it is the ALJ's duty to investigate and develop the arguments both for and against the granting of benefits.'" *Amrock v. Colvin*, No. 3:12–CV–55(FJS), 2014 WL 1293452, at *4 (N.D.N.Y. Mar. 31, 2014) (quoting *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir.2004)). "This affirmative obligation is present even when counsel represents the claimant." *Id.*

■ However, "the affirmative duty imposed on an ALJ to develop an administrative record fully is not without limits." *Id.* at *4. The ALJ is not required to "obtain every medical file from every medical source the claimant has seen." *Ubiles*, 2012 WL 2572772 at *10. The ALJ is only required to "request additional evidence if the administrative record does not contain sufficient evidence to make a fair determination." *Id.* Indeed, "[o]n the 'flip-side' of this same proposition, 'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'" *Hart v. Colvin*, No. 12–CV–1043–JTC, 2014 WL 916747, at *7 (W.D.N.Y. Mar. 10, 2014) (quoting *Petrie v. Astrue*, 412 Fed.Appx. 401, 406 (2d Cir.2011)).

Plaintiff argues that the medical opinions of Dr. Toor and Dr. Balderman suggest that Plaintiff had "significant work-related limitations regarding the bilateral hands." (Dkt. 9–1 at 18). Plaintiff also

argues that there was a "noticeable gap in the record regarding treatment of Plaintiff's bilateral arm, wrist, and hand conditions, and the ALJ was duty-bound to request the missing treatment evidence." (Dkt. 9–1 at 19). Specifically, Plaintiff points to references in the administrative record to Plaintiff's surgical treatment for carpal tunnel syndrome and argues that the ALJ was required to obtain Plaintiff's surgical records. (*Id.* at 20).

At most, Dr. Toor assessed "moderate" limitations based on his examination of Plaintiff's wrists, hands, range of motion, and grip strength. (Tr. 410–11). Dr. Balderman assessed only "mild limitations" related to Plaintiff's hand and finger dexterity and grip strength. (Tr. 522). Although the 966–page administrative transcript does not contain the records relating to Plaintiff's carpal tunnel surgery, the record does contain notes from Plaintiff's treating physicians that she had been cleared by her surgeon to return to work following the surgery. (Tr. 353, 942). When the ALJ questioned Plaintiff about her conditions, Plaintiff stated that she had restricted use of her right hand as a result of an injury 20 years prior to the hearing, but she did not indicate that carpal tunnel syndrome caused the limited use of her hands. (Tr. 63–67, 73, 80).

Based on the above findings, there was substantial evidence to support the ALJ's finding that Plaintiff's carpal tunnel was not a severe impairment.

### 3. Step Three

At the third step, the ALJ analyzed the medical evidence and found that Plaintiff did not have a listed impairment or combination of impairments that would render her disabled. (Dkt. 1–1 at 9–10). Specifically, the ALJ considered Listings 1.02, 5.00, 12.04, and 12.06. (*Id.* at 9). Plaintiff does not contest the ALJ's findings at step three, and it appears that the ALJ's find-

ings were supported by substantial evidence.

### 4. Step Four

At the fourth step, the ALJ determined Plaintiff's residual functional capacity to perform work. (Dkt. 1–1 at 10). The ALJ concluded that plaintiff had the following RFC:

> [t]o perform medium work, as defined in 20 CFR 416.967(c), except that she is limited to frequent fingering and handling, simple tasks, and occasional interaction with co-workers and the general public.

(*Id.*).

#### a. Substantial Evidence

##### i. Consideration of Medical Opinions

■ Plaintiff contends the ALJ erred by failing to weigh the medical opinions of Dr. Toor, Dr. Balderman, or Dr. Hamilton. (Dkt. 9–1 at 22–24). As Plaintiff notes, the ALJ only assigned weight to the opinion of Dr. Jones. (*Id.* at 23). Plaintiff further argues that the ALJ failed to explain the weight given to the opinion of Dr. Jones, whose complete opinion, according to Plaintiff, was inconsistent with the RFC finding. (*Id.* at 24). The Commissioner counters that the ALJ properly considered the opinions of these physicians in all respects. (Dkt. 11 at 33–36).

#### *Dr. Balderman and Dr. Hamilton*

The ALJ was not required to evaluate the opinions of Dr. Balderman or Dr. Hamilton because those opinions pre-date the relevant time period in this case. *See Krach v. Comm'r of Soc. Sec.*, No. 3:13–CV–1089(GTS/CFH), 2014 WL 5290368, at *9 (N.D.N.Y. Oct. 15, 2014) ("the ALJ is under no obligation to consider evidence from a time before the relevant period"). The relevant time period for an SSI benefits application is "the date the SSI appli-

cation was filed, to ... the date of the ALJ's decision." *Frye ex rel. A.O. v. Astrue,* 485 Fed.Appx. 484, 488 n. 2 (2d Cir. 2012). Plaintiff filed her application for benefits on September 23, 2010, and ALJ Costello issued his decision on June 29, 2012. (Tr. 51, 230, 276; Dkt. 1–1 at 14). Accordingly, the ALJ was not required to consider the May 6, 2010 opinions of Dr. Balderman or Dr. Hamilton (Tr. 516–53), as this evidence fell outside of the relevant time period.

### Dr. Toor

The opinion of Dr. Toor did fall within the relevant time period, as he issued his opinion on November 16, 2010. (Tr. 408–11). "[T]he opinions of consulting sources 'may constitute substantial evidence if they are consistent with the record as a whole.'" *Smith v. Colvin,* 17 F.Supp.3d 260268 (W.D.N.Y.2014) (quoting *Barringer v. Comm'r of Soc. Sec.,* 358 F.Supp.2d 67, 79 (N.D.N.Y.2005). "This is particularly so where the consultant directly examines the applicant." *Id.* (citing 20 C.F.R. § 416.927(c)(1)) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.")).

"[C]ourts have found harmless error where the ALJ failed to afford weight to a treating physician when an analysis of weight by the ALJ would not have affected the outcome." *Ryan v. Astrue,* 650 F.Supp.2d 207, 217 (N.D.N.Y.2009); *see Jones v. Barnhart,* No. 02 Civ. 0791(SHS), 2003 WL 941722, at *10 (S.D.N.Y. Mar. 7, 2003) (finding harmless error in the ALJ's failure to grant weight to Plaintiff's treating physicians because "he engaged in a detailed discussion of their findings, and his decision does not conflict with them"). Here, ALJ Costello cited extensively to consultative examiner Dr. Toor's opinion, noting at steps two and four of his analysis that Dr. Toor found that Plaintiff had mild

to moderate limitations with respect to the use of her hands, but that no other limitations were suggested by the evaluation. (Dkt. 1–1 at 7–8, 12). This detailed discussion of Dr. Toor's opinion and further reliance on the opinion in creating the RFC suggests that a specific assignment of weight would not have impacted the outcome of the ALJ's decision. There are no grounds to alter the ALJ's findings with respect to the application of Dr. Toor's opinion.

### Dr. Jones

Dr. Jones noted "chronic problems maintaining attention and concentration, possibly due to ADHD," and further opined that Plaintiff could not relate adequately with others due to a history of abuse. (Tr. 437). However, Dr. Jones opined that Plaintiff could follow and understand simple directions, perform simple and complex tasks independently, maintain a regular schedule, learn new tasks, make appropriate decisions, and appropriately deal with stress. (*Id.*). Plaintiff argues that it was inappropriate for the ALJ to assign Dr. Jones' opinion "great weight" and then fail to incorporate problems maintaining attention and concentration into his RFC finding. (Dkt. 9–1 at 24).

Although Dr. Jones noted that Plaintiff had difficulty maintaining attention and concentration, she nevertheless concluded that Plaintiff could perform simple and complex tasks independently. (Tr. 437). The ALJ incorporated this conclusion into his RFC finding, even limiting Plaintiff to simple tasks. (Dkt. 1–1 at 10). ALJ Costello noted that Plaintiff's mental health treatment records showed that Plaintiff was not fully compliant with treatments, missed appointments, and was potentially "more interested in being declared mentally disabled than in obtaining help for her symptoms of depression and anxiety." (Dkt. 1–1 at 12). Accordingly, the ALJ's

application of Dr. Jones' opinion to the formulation of his RFC finding was supported by substantial evidence in the record.

### ii. Inconsistency Between Step 3 and 4 Findings

In a footnote, Plaintiff claims that the ALJ's RFC finding was inconsistent with his Step 3 finding that Plaintiff had moderate difficulties with regard to concentration, persistence, or pace and that this inconsistency is cause for remand. (Dkt. 9–1 at 24). The Commissioner argues that the findings at Step 3 of the sequential analysis are not directly transferable to the RFC assessment, and that no error occurred. (Dkt. 11 at 36–37).

"There is no requirement that an ALJ use the same language from step two or three in the RFC analysis, so the absence of the words 'concentration, persistence, or pace' in the ALJ's RFC assessment is not *per se* error." *Peryea v. Comm'r of Soc. Sec.*, No. 5:13–CV–0173 (GTS/TWD), 2014 WL 4105296, at *10 (N.D.N.Y. Aug. 20, 2014). "[V]arious courts have held that when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, limiting a claimant to only unskilled work sufficiently accounts for such limitations." *Bartell v. Comm'r of Soc. Sec.*, No. 5:13–cv–843 (GLS/ESH), 2014 WL 4966149, at *3 (N.D.N.Y. Sept. 30, 2014) (collecting cases); *see Rodriguez v. Colvin*, No. 13–CV–6360, 2014 WL 3882191, at *17 (W.D.N.Y. Aug. 6, 2014) (finding that where the ALJ determined that the plaintiff had difficulty with concentration, persistence, or pace, the ALJ accounted for those limitations by limiting the plaintiff to work requiring simple instructions and directions); *Diakogiannis v. Astrue*, 975 F.Supp.2d 299, 315 (W.D.N.Y.2013) (deter-

mining that an RFC limiting plaintiff to simple, routine, repetitive tasks was consistent with the ALJ's step two assessment that plaintiff had moderate difficulties with concentration, persistence, or pace).

Here, the ALJ's finding that Plaintiff can engage in simple tasks is consistent with the opinions of Dr. Jones and Dr. Altmansberger, who determined that although Plaintiff had mild to moderate difficulties with regard to concentration, persistence, or pace, she was capable of performing unskilled work. (Tr. 426–28, 436–37). These opinions provide substantial evidence to support the ALJ's RFC.

### iii. Duty to Develop the Record

Plaintiff argues that the administrative record does not contain a treating source opinion concerning her physical and mental functional abilities and limitations, and contends the ALJ's failure to request such an opinion was legal error. (Dkt. 9–1 at 25–26). The Commissioner maintains that the ALJ had sufficient evidence in the record to reach his findings. (Dkt. 11 at 37–38).

"It is well settled that the ALJ has an affirmative duty to develop the record in a disability benefits case, and that remand is appropriate where this duty is not discharged." *Brown v. Comm'r of Soc. Sec.*, 709 F.Supp.2d 248, 255 (S.D.N.Y.2010) (citations omitted). "The ALJ's duty to develop the record remains the same regardless of whether the claimant is represented by counsel." *Cruz v. Astrue*, 941 F.Supp.2d 483, 495 (S.D.N.Y.2013). Encompassed in this duty is the requirement that an ALJ assemble the claimant's complete medical history and re-contact treating physicians or obtain consultative examinations where the information received is inadequate to determine whether the claimant is disabled. *See Wells v. Colvin*, No. 14–CV–197–JTC,

2015 WL 1280536, at *7 (W.D.N.Y. Mar. 20, 2015) (citing 20 C.F.R. §§ 416.912(e), 416.927(e)(2)(iii)).

Despite this duty, courts in this Circuit have found that "it is not per se error for an ALJ to make the RFC determination absent a medical source assessment as to what the claimant can still do despite the limitations caused by his or her impairments." *Housser v. Colvin*, No. 13–CV–1133–JTC, 2015 WL 162985, at *5 (W.D.N.Y. Jan. 7, 2015) (quotations omitted). "[R]emand is not always required when an ALJ fails in his duty to request opinions, particularly where ... the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 Fed.Appx. 29, 33 (2d Cir.2013). "Although an ALJ has an affirmative duty to develop the administrative record even when a claimant is represented by counsel, where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Lowry v. Astrue*, 474 Fed.Appx. 801, 804 (2d Cir.2012) (quotations and citations omitted). The question is whether the administrative record, even lacking the opinion of a treating physician, is "robust enough to enable a meaningful assessment of the particular conditions on which the petitioner claims disability." *Sanchez v. Colvin*, No. 13 Civ. 6303(PAE), 2015 WL 736102, at *7 (S.D.N.Y. Feb. 20, 2015). *Cf. Rosa*, 168 F.3d at 79–80 (finding the ALJ committed legal error where the ALJ failed to develop the facts of the case where there were "scant" medical notes and the ALJ did not seek records from numerous physicians referenced in the claimant's testimony).

"Under the particular circumstances of this case, the Court finds that the ALJ was not remiss with regard to [his] duty to request opinions from Plaintiff's treating sources." *Hogan v. Colvin*, No. 1:12–cv–1093(MAT), 2015 WL 667906, at *6 (W.D.N.Y. Feb. 17, 2015). The opinions of consultative examiners Dr. Jones and Dr. Toor were not "inconsistent with the relatively benign clinical findings and assessments by Plaintiff's treating physicians." *Id.*

As for Plaintiff's alleged physical impairments, Plaintiff's treating physicians were unable to identify any source for Plaintiff's alleged abdominal or leg pain but were treating each condition with medication. (Tr. 627, 637, 643, 645, 650, 653, 660, 667, 908, 933, 947). In addition, Plaintiff's treating physician Dr. Kennedy noted that Plaintiff had been cleared to work by her surgeon. (Tr. 353, 942). These benign findings with respect to Plaintiff's alleged physical limitations were consistent with Dr. Toor's finding that Plaintiff had some mild to moderate limitations with respect to the use of her hands, but that no other limitations existed. (Tr. 411).

With respect to Plaintiff's alleged mental impairments, although there are medical records suggesting that Plaintiff was distracted, anxious, or depressed during therapy sessions (Tr. 385, 733, 746, 785, 799, 811, 860, 940), there are also medical records stating that Plaintiff was goal-oriented, had good insight and good judgment, and a logical and coherent thought form. (Tr. 573, 814, 825, 940). Further, Dr. Jones opined that plaintiff could follow and understand simple directions, perform simple and complex tasks independently, maintain a regular schedule, learn new tasks, make appropriate decisions, and appropriately deal with stress. (Tr. 437). Clinical treatment notes in the record stated that Plaintiff had "mild depression,"

and "no apparent cognitive deficit." (Tr. 828, 830, 943). Notably, Plaintiff's mental health providers had previously determined that Plaintiff was able to work. (Tr. 897, 938). On more than one occasion, Plaintiff expressed frustration with Ms. Stanton for completing a disability report and indicating that Plaintiff was able to work. (Tr. 897, 938). In addition, Plaintiff's most recent therapist suggested that Plaintiff's "best bet" in receiving SSI benefits would be to get a statement from her doctors that she had physical limitations precluding her from work. (Tr. 939). Accordingly, there was substantial evidence in the record to provide a basis for the ALJ to formulate his RFC without a treating physician opinion.

In sum, the lengthy administrative record was sufficiently robust to provide ALJ Costello with sufficient information to conduct a meaningful assessment of Plaintiff's alleged conditions without the medical source opinions of Plaintiff's treating physicians.

#### b. Credibility Determination

Plaintiff argues that the ALJ "failed to follow the appropriate legal standard when evaluating Plaintiff's credibility." (Dkt. 9–1 at 29–30). The Commissioner claims that the ALJ properly considered whether Plaintiff's impairments caused symptoms of such severity as to preclude her from engaging in substantial gainful activity in conducting his credibility analysis. (Dkt. 11 at 38–39).

The Social Security regulations require a two-step process for the ALJ to consider the extent to which subjective evidence of symptoms can reasonably be accepted as consistent with the medical and other objective evidence. *Brownell v. Comm'r of Soc. Sec.,* No. 1:05–CV–0588 (NPM/VEB), 2009 WL 5214948, at *3 (N.D.N.Y. Dec. 28, 2009). First, the ALJ considers whether the medical evidence shows any impair-

ment "which could reasonably be expected to produce the pain or other symptoms alleged...." 20 C.F.R. § 404.1529(a). Second, if an impairment is shown, the ALJ must evaluate the "intensity, persistence, or functionally limiting effects" of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. § 404.1529(b). When the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the credibility of the claimant's statements considering the details of the case record as a whole. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).

In the instant case, the ALJ properly applied the two step analysis. First, the ALJ found that Plaintiff's medically determinable impairments could be expected to cause the alleged symptoms. (Dkt. 1–1 at 11–12). Second, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not generally credible...." (Tr. 22).

In evaluating a Plaintiff's credibility, the ALJ must consider several factors, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back, standing for 15 to 20

minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Stewart v. Barnhart,* 235 F.R.D. 579, 590 (W.D.N.Y.2006); *see* 20 C.F.R. § 404.1529(c).

Here, ALJ Costello properly discussed Plaintiff's reported activities of daily living, allegations of pain, allegations of functional capabilities and limitations, and reported medications and treatments received in accordance with the applicable regulations. (Dkt. 1–1 at 11–12).

Plaintiff contends the ALJ should have considered the clinical findings contained in the treatment notes of EBHC in evaluating Plaintiff's mental impairments, and should have considered physical objective findings supporting Plaintiff's complaints of abdomen pain. (Dkt. 9–1 at 29–30).

■ Specifically, Plaintiff argues that ALJ Costello erred by not referencing approximately two years of mental health treatment notes within his discussion of Plaintiff's mental limitations. (Dkt. 9–1 at 27–29). Plaintiff notes that she was treated at EBHC on a consistent basis from December 9, 2009 through January 2012, and objects to the fact that the ALJ only referenced a single EBHC treatment note from January 2012. (Dkt. 9–1 at 27). The large majority of EBHC treatment notes in the record pre-date Plaintiff's September 23, 2010 application date, and accordingly the ALJ was not required to consider this evidence. *See Krach,* 2014 WL 5290368, at *9. The record shows that Plaintiff's treatment at EBHC after September 23, 2010 was sporadic due to a number of factors, including the fact that Plaintiff's primary therapist retired and that Plaintiff did not appear for a number of appointments. (Tr. 560, 573, 784, 845,

897–903, 942). Ultimately, Plaintiff transferred her mental health treatment to Jordan because she was unsatisfied with EBHC, and this is what the ALJ properly noted in his decision. (Dkt. 1–1 at 8). In any event, "[a]lthough the hearing officer is required to fully develop the record, [he] is not required to discuss all the evidence submitted, and [his] failure to cite specific evidence does not indicate that it was not considered." *Greene v. Colvin,* 936 F.Supp.2d 216, 226 (W.D.N.Y.2013).

Contrary to Plaintiff's arguments, the ALJ did consider the objective findings in the record with respect to Plaintiff's abdomen pain, and concluded that multiple tests did not reveal a cause for Plaintiff's symptoms aside from gastritis. (Dkt. 1–1 at 12). Plaintiff now contends that her test results revealed that she had "scattered atherosclerotic calcifications," "hepatomegaly," and "prominence of the common bile duct," and that these results suggest support for "Plaintiff's pain complaints and resulting functional limitations." (Dkt. 9–1 at 29). This assertion is simply not supported by the medical record. Although the tests did reveal those conditions, Plaintiff's gastroenterologist and primary care physician each concluded that these findings would not contribute to Plaintiff's allegations of pain. (Tr. 643, 660, 709, 906, 908, 946–47, 952).

■ "It is the function of the Commissioner, and not the reviewing court, to pass on the credibility of witnesses, including the claimant's description of symptoms and pain, and to resolve material conflicts in the testimony." *Echevarria v. Apfel,* 46 F.Supp.2d 282, 293 (S.D.N.Y.1999). The Court has found no reason to disturb the ALJ's findings with respect to the credibility of Plaintiff's testimony.

### 5. Step Five

The ALJ then proceeded to the fifth step, which is comprised of two parts.

First, the ALJ assessed Plaintiff's job qualifications by considering her physical ability, age, and education. (Dkt. 1–1 at 12). At the time the application was filed, Plaintiff was 46 years old and she had a limited education with no relevant past work. (*Id.* at 12–13). Second, the ALJ determined whether there were jobs existing in the national economy that a person with Plaintiff's qualifications and RFC could perform. (*Id.* at 13). ALJ Costello found that Plaintiff's ability to perform work at all exertional levels was compromised by Plaintiff's nonexertional limitations. (*Id.*).

■ At step five of the analysis, the burden shifts to the Commissioner to demonstrate that there are a substantial number of jobs available in the national economy for Plaintiff to perform. *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir.1998). The Commissioner will utilize the Medical Vocational Guidelines or "Grids" found at 20 C.F.R. Part 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38–39 (2d Cir.1996). However, "if a claimant has nonexertional impairments which 'significantly limit the range of work permitted by his exertional limitations,' then the Commissioner cannot rely upon the grids, and instead 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or perform.'" *Griffith v. Astrue*, No. 08–cv–6004 CJS, 2009 WL 909630, at *4 (W.D.N.Y. Mar. 31, 2009) (citing *Pratts*, 94 F.3d at 39).

■ Having properly determined Plaintiff's residual functional capacity, "[the ALJ] did not err in using that residual functional capacity to determine (with the help of a vocational expert) whether jobs existed in the national economy" that Plaintiff could perform. *Pellam v. Astrue*, 508 Fed.Appx. 87, 91 (2d Cir.2013); *see also Ridgeway v. Colvin*, No. 12–CV–6548T, 2013 WL 5408899, at *10 (W.D.N.Y. Sept. 25, 2013) ("Because there is substantial evidence in the record to support the ALJ's assessment of Plaintiff's RFC, the ALJ is entitled to rely on the vocational expert's testimony that Plaintiff could perform other jobs that exist in significant numbers in the national economy."). Accordingly, the ALJ did not err in relying on the testimony of the vocational expert as well as Plaintiff's age, education, work experience, and RFC in concluding that Plaintiff was not disabled within the meaning of the Act.

## IV. CONCLUSION

The Court has considered Plaintiff's remaining arguments and finds them to be without merit. For the foregoing reasons, the Commissioner's determination that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. 11) is granted, and Plaintiff's motion for judgment on the pleadings (Dkt. 9) is denied. Plaintiff's complaint is dismissed with prejudice.

SO ORDERED.