10-2070-cv
*Petrie v. Astrue*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

# SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 8th day of March, two thousand eleven.

PRESENT:

WILFRED FEINBERG,
DEBRA ANN LIVINGSTON,
RAYMOND J. LOHIER, JR.,

*Circuit Judges.*

_____

BRUCE D. PETRIE,

*Plaintiff-Appellant*,

v.                                                                No. 10-2070-cv

MICHAEL J. ASTRUE, Commissioner of Social Security,

*Defendant-Appellee*.

_____

HOWARD D. OLINSKY (Jaya Shurtliff, *on the brief*), Olinsky & Shurtliff, Syracuse, New York, *for Plaintiff-Appellant*.

SUSAN REISS, Special Assistant U.S. Attorney (Stephen P. Conte, Regional Chief Counsel – Region II, Office of the General Counsel Social Security Administration, *on the*

1

*brief*), *for* Richard S. Hartunian, U.S. Attorney for the Northern District of New York, Syracuse, New York, *for Defendant-Appellee.*

UPON DUE CONSIDERATION, it is hereby ORDERED, ADJUDGED, and DECREED that the judgment of the district court be AFFIRMED.

Plaintiff-Appellant Bruce D. Petrie ("Petrie") appeals from a judgment of the U.S. District Court for the Northern District of New York (Sharpe, *J.*) affirming the decision of the Commissioner of Social Security Michael J. Astrue ("Commissioner"), and dismissing Petrie's complaint. Petrie challenges the Commissioner's denial of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. § 301 et seq. Pursuant to 28 U.S.C. § 636(b)(1), Petrie's case was referred to a Magistrate Judge (Bianchini, *M.J.*) who issued a Report and Recommendation ("R&R") recommending that the decision of the Commissioner be affirmed. On March 19, 2010, the district court adopted the R&R in its entirety and dismissed Petrie's complaint. Petrie timely appealed on May 17, 2010. We assume the parties' familiarity with the underlying facts and procedural history.

On appeal, Petrie argues that the Administrative Law Judge ("ALJ") failed to apply the proper legal standards in evaluating his mental impairments and his residual functional capacity ("RFC"),[1] and in denying him DIB and SSI benefits under the Social Security Act. Petrie contends that the ALJ did not properly apply the "Treating Physician Rule," 20 C.F.R. §§ 404.1527, 416.927, and the Psychiatric Review Technique (also called the "Special Technique"). Petrie also argues that the ALJ was required to consult a vocational expert to determine whether Petrie could perform his

---

[1] The Social Security Administration's regulations define RFC as the most work a claimant can perform in a work setting despite his physical or mental limitations. *See* 20 C.F.R. § 404.1545(a).

past work as a cook.

"When considering an appeal of a disability case, we undertake our own plenary review of the administrative record to determine whether substantial evidence supports the [Commissioner]'s denial of benefits." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (internal quotation marks omitted). Our focus "'is not so much on the district court's ruling as it is on the administrative ruling.'" *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quoting *Schaal v. Apfel*, 134 F.3d 496, 500-01 (2d Cir. 1998)). We do not determine *de novo* whether a claimant is disabled; rather, we set aside an ALJ's decision only where it is "based upon legal error or is not supported by substantial evidence." *Pratts*, 94 F.3d at 37. Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must "consider[ ] the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

For purposes of both DIB and SSI eligibility, a claimant is "disabled," and thus entitled to benefits, where he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Berry v. Schweiker*, 675 F.2d 464, 466 (2d Cir. 1982). A claimant's physical or mental impairment is not "disabling" under the Social Security Act unless it is "of such severity that he is not only unable to do his previous work but

3

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also Rosa*, 168 F.3d at 77.

The Social Security Administration has promulgated a five-step sequence for evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; *see also Berry*, 675 F.2d at 467. First, the Commissioner of Social Security considers whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520 (a)(4)(i), 416.920(a)(4)(i); *see also Berry*, 675 F.2d at 467. If he is not, the Commissioner proceeds to the second step and determines whether the claimant has a "severe medically determinable physical or mental impairment," 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), that "significantly limits his physical or mental ability to do work activities," *Berry*, 675 F.2d at 467. If the claimant does suffer such an impairment, the third step is "whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations." *Berry*, 675 F.2d at 467; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If so, the claimant is *per se* "disabled" and thus presumptively qualified for benefits. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the Commissioner proceeds to the fourth step and examines whether, "despite the claimant's severe impairment, he has the residual functional capacity to perform his past work." *Berry*, 675 F.2d at 467; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant is unable to perform his past work, the Commissioner finally determines whether there is other work the claimant can perform, taking into consideration the claimant's RFC, age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Berry*, 675 F.2d at 467.

The claimant bears the burden of proof as to the first four steps. *See Rosa*, 168 F.3d at 77;

4

*Berry*, 675 F.2d at 467. Once the claimant has fulfilled his burden, it shifts to the Commissioner at step five. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). This, however, is only a limited burden shift, in that the Commissioner "need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity." *Id.*; *see also* 20 C.F.R. §§ 404.1560(c)(2); 416.960(c)(2).

**A. Treating Physician Rule**

Petrie first contends that the ALJ misapplied the Treating Physician Rule by failing to give various medical opinions controlling weight. He also argues that the ALJ had an obligation to re-contact Petrie's treating sources when he found their opinions inadequate. Further, Petrie argues that, in giving his treating physicians' opinions minimal weight, the ALJ failed to consider all relevant factors. Petrie's objections have no merit.

"A treating physician's statement that the claimant is disabled cannot itself be determinative." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (internal quotation marks omitted). Nevertheless, under the "treating physician" rule, "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s)" is given "controlling weight" if the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Green-Younger*, 335 F.3d at 106; *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

"The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." *Mongeur v. Heckler*, 722 F.2d 1033,

1039 n.2 (2d Cir. 1983) (per curiam). The opinion of the treating physician "is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam). The report of a consultative physician may constitute such substantial evidence. *Mongeur*, 722 F.2d at 1039.

*1. Controlling Weight*

Petrie insists that the medical opinions of two of his physicians, who concluded that he could not perform unskilled work, were entitled to controlling weight. The ALJ refused to give controlling weight to these opinions because one of the physicians, Dr. Suresh Patil, had only examined Petrie once, while the other, Dr. Vilas Patil, had only four treatment notes bearing his signature, two of which were merely co-signatures on reports by other providers. In addition, Dr. Vilas Patil completed his medical opinion over a year after he had last personally seen Petrie. Petrie nevertheless contends that this was an improper ground on which to refuse to give controlling weight, since all of his mental health providers worked at the same institution and thus had access to Petrie's records and to one another.

We disagree. In *Mongeur*, we emphasized that the opinion of a treating physician is given extra weight because of his unique position resulting from the "*continuity* of treatment he provides and the doctor/patient *relationship* he develops." 722 F.2d at 1039 n.2 (emphasis added). By contrast, we reasoned that a physician who only examined a claimant "once or twice" did not see that claimant regularly and did not develop a physician/patient relationship with the claimant, *id.*, even though other practitioners in the same facility had also submitted medical opinions on behalf of the claimant, *id.* at 1035. As a result, we concluded that such a physician's medical opinion was

6

"not entitled to the extra weight of that of a 'treating physician.'" *Id.* at 1039 n.2. The ALJ therefore did not err in refusing to find Drs. Vilas Patil's and Suresh Patil's opinions controlling, due to the physicians' "limited and remote contact" with Petrie.

Moreover, the medical opinions submitted by Petrie were contradicted by those of several medical experts. *See Halloran*, 362 F.3d at 32; *Mongeur*, 722 F.2d at 1039. As the ALJ noted, two consultative psychologists, including one from the state agency, opined that he had abilities sufficient to perform unskilled work. The ALJ rightly found that these opinions were consistent with Petrie's mental status reports, which noted significant improvements since Petrie had begun treatment. The ALJ relied on these reports to find that Petrie had been sleeping well, maintained a good appetite, had good humor and appropriate affect, and was generally cooperative. He also observed that Petrie's Global Assessment of Functioning Score ("GAF")[2] was assessed at 65, indicating mild symptoms but generally good functioning. The ALJ therefore did not err in concluding that Drs. Vilas Patil's and Suresh Patil's opinions were not entitled to controlling weight.

*2. Obligation to Seek Additional Information*

Petrie next argues that the ALJ was required to seek additional information from Petrie's treating sources before refusing to give their opinions controlling weight. Petrie's contention is without merit.

---

[2] GAF is a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 376-77 (4th ed., text revision, 2000) ("DSM-IV-TR"). The GAF scale ranges from 0 to 100; GAF scores from 61-70 indicate some mild symptoms or some difficulty in social, occupational, or school situations, but general functioning and the existence of some meaningful personal relationships. DSM-IV-TR at 34. GAF scores between 51-60 indicate that the individual has moderate symptoms or moderate difficulty in social, occupational, or school situations. DSM-IV-TR at 34.

We have held that "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa*, 168 F.3d at 79 (citing *Schaal*, 134 F.3d at 505). "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel." *Id.* (internal quotation marks omitted). However, we have also recognized "the flip-side of this same proposition": "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Id.* at 79 n.5.

Petrie does not point to, nor do we find, any "deficiencies" or "obvious gaps" in the administrative record. To the contrary, the voluminous record is replete with Petrie's medical records detailing the course of his impairments and treatment. The ALJ was therefore under no obligation to seek additional information from Petrie's treating sources.

*3. Failure to Consider All Factors*

Petrie next contends that the ALJ failed to consider all relevant factors in giving his treating physicians' opinions minimal weight. This contention is also without merit.

When an ALJ refuses to give controlling weight to the medical opinion of a treating physician, he/she must consider various "factors" in deciding how much weight to give the opinion. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Halloran*, 362 F.3d at 32. These factors include: "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion."

8

*Halloran*, 362 F.3d at 32; *Schaal*, 134 F.3d at 503. The Commissioner must also give "good reasons" for the weight given to the treating source's opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Halloran*, 362 F.3d at 32; *Schaal*, 134 F.3d at 503-04. Nevertheless, where "the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Mongeur*, 722 F.2d at 1040; *see also Halloran*, 362 F.3d at 32; *Berry*, 675 F.2d at 469. Similarly, where "application of the correct legal standard could lead to only one conclusion, we need not remand." *Schaal*, 134 F.3d at 504.

Of the above-listed factors, Petrie complains that the ALJ did not expressly consider: 1) the length of the treatment relationship and frequency of the examination; 2) the extent to which the opinions of Drs. Vilas Patil and Suresh Patil were supported by medical and laboratory findings; and 3) whether the physicians are specialists. This contention is without merit.

At the start, the ALJ clearly considered the length of the treatment relationship and frequency of the examination in assigning minimal weight to Dr. Vilas Patil's opinion, since he noted that Dr. Patil had only four treatment notes bearing his signature, two of which appeared to be for examinations performed by another provider. Dr. Vilas Patil's own opinion states that he treated Petrie "sporadically," and the ALJ also observed that at the time Dr. Patil rendered his opinion, it had been a year since he had last seen Petrie personally. Similarly, the ALJ assigned minimal weight to Dr. Suresh Patil's opinion because it followed only one initial appointment with Petrie.

Moreover, although he ultimately found Dr. Suresh Patil's opinion to have little weight, the ALJ clearly considered the extent to which it was supported by medical findings. The ALJ credited

9

Dr. Suresh Patil's assigning a GAF score of 55-60 to Petrie, indicating "merely moderate symptoms or difficulty functioning," and Dr. Patil's observation that Petrie had a poor treatment compliance record and sometimes stopped his medications altogether, resulting in an increase in symptoms. The ALJ's express consideration of Dr. Vilas Patil's medical opinion was brief, moreover, principally because the medical opinion itself contained few medical or laboratory findings to consider. Dr. Vilas Patil described his clinical findings by listing symptoms that Petrie himself reported, and by noting that Petrie displayed "good eye contact, euthymic mood, and anxiety." Dr. Vilas Patil's opinion also declined to assign Petrie a GAF score on the basis of "insufficient information."

Finally, the ALJ did not expressly discuss the fact that Drs. Vilas Patil and Suresh Patil were specialists and thus entitled to have their opinions be given greater weight. It is nevertheless clear from the record as a whole that the ALJ properly considered this factor. The regulations provide that an opinion of a specialist regarding medical issues related to his or her area of specialty must be given more weight than the opinion of a source who is not a specialist. *See* 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5). The regulations treat statements from both physicians and psychologists as "medical opinions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) ("Medical opinions are statements from physicians and psychologists . . . that reflect judgments about the nature and severity of [a claimant's] impairment(s) . . . ."). Here, the ALJ expressly treated the assessments of Drs. Vilas Patil and Suresh Patil as "medical opinions of record" and noted that, pursuant to a ruling of the Social Security Administration, findings of fact made by a state agency psychological consultant must be treated as an expert opinion, albeit one from a non-examining source. *See* SSR 96-6p.

In sum, the ALJ gave proper consideration to all relevant factors pursuant to applicable

regulations. Petrie's argument is therefore unpersuasive.

**B. Psychiatric Review Technique**

Petrie next argues that the ALJ failed to apply properly the Psychiatric Review Technique at the second and third steps of the five-step evaluation. Petrie generally repeats his claim, here, that the ALJ failed to give proper weight to the medical opinions of Drs. Vilas and Suresh Patil. We disagree.

In addition to the five-step analysis, the regulations "require application of a 'special technique' at the second and third steps of the five-step framework." *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008); *see also* 20 C.F.R. §§ 404.1520a(a), 416.920a(a). This technique "requires a reviewing authority to determine first whether the claimant has a 'medically determinable mental impairment.'" *Kohler*, 546 F.3d at 265-66 (quoting 20 C.F.R. § 404.1520a(b)(1)). "If the claimant is found to have such an impairment, the reviewing authority must 'rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c),' . . . which specifies four broad functional areas." *Id.* at 266 (quoting 20 C.F.R. § 404.1520a(b)(2)). These areas are: "(1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation." *Id.* (citing 20 C.F.R. § 404.1520a(c)(3)), *see also* 20 C.F.R § 416.920a(c)(3).

Each of the first three areas is rated on a scale of "[n]one, mild, moderate, marked, and extreme." 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). The fourth area is rated on a scale of "[n]one, one or two, three, four or more." *Id.* "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny

11

benefits." *Kohler*, 546 F.3d at 266. By contrast, if the claimant's mental impairment is severe, then the reviewing authority must "compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders" to determine whether the impairment "meets or is equivalent in severity to any listed mental disorder." *Id.* (citing 20 C.F.R. § 404.1520a(d)(2)). If yes, then the claimant is "disabled." *Id.* If not, the reviewing authority must then assess the claimant's residual functional capacity. *Id.* (citing 20 C.F.R. § 404.1520a(d)(3)).

The regulations also require that the application of the special technique be documented. *Id.* (citing 20 C.F.R. § 404.1420a(e)). Generally, a medical or psychological consultant will complete a standard document, known as a "Psychiatric Review Technique Form" ("PRTF"). *Id.* Pursuant to the regulations, the ALJ's written decision must "reflect application of the technique, and . . . 'include a specific finding as to the degree of limitation in each of the [four] functional areas.'" *Id.* (quoting 20 C.F.R. § 404.1520a(e)(2)).

In this case, the ALJ relied on a PRTF completed by a state agency reviewing psychologist, who concluded in 2005 that Petrie's mental impairments caused a mild restriction of activities of daily living, and moderate difficulties in maintaining social function, concentration, persistence, or pace. Although the reviewing psychologist found the record to contain insufficient evidence of repeated episodes of decompensation, each of extended duration, the ALJ found that Petrie had no such repeated episodes because Petrie was hospitalized only once for four days during the relevant time period. The ALJ thus adopted the PRTF in part and proceeded to assess Petrie's RFC.

We agree with the district court that the ALJ properly applied the special technique and that substantial evidence supported his conclusion. Evidence in the record consistently showed that Petrie was able to dress, bathe, and groom himself on a daily basis. Petrie himself stated that he

12

could cook and prepare food, manage money, use public transportation, and perform general cleaning, laundry, and shopping. A consultative examination further found that Petrie's attention, concentration, and memory skills were intact, and that his intellectual functioning was in the average range. Petrie was even offered a cleaning job by the manager of his residence, which Petrie later accepted. In light of this evidence, we decline to find that the ALJ erred in his application of the Psychiatric Review Technique.

**C. Vocational Expert and Past Work**

Petrie finally argues that the ALJ was required to consult a vocational expert in determining whether, under step four, Petrie was capable of performing his past work as a cook. Petrie also adds that the ALJ erroneously identified a semi-skilled occupation as unskilled work that Petrie was capable of performing.

Petrie's arguments are unavailing. Under the fourth step of the five-step analysis, "the claimant has the burden to demonstrate an inability to return to h[is] previous specific job and an inability to perform h[is] past relevant work generally." *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003) (emphasis omitted). This inquiry "requires separate evaluations of the previous specific job and the job as it is generally performed." *Id.* The *Dictionary of Occupational Titles* ("DOT") is used to evaluate jobs as they are generally performed. *See id.* While an expert "is often called upon" to explain the requirements of particular jobs, *see id.*, step four of the analysis does not *require* that an ALJ consult an expert. *See* 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2) ("A vocational expert or specialist *may* offer expert opinion testimony . . . about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally

13

performed in the national economy." (emphasis added)). The ALJ therefore did not err in declining to consult a vocational expert.

In addition, we agree with the district court that the ALJ's citation to a semi-skilled cooking occupation in the DOT was a mere typographical error. The ALJ's citation to DOT code number 313.687-010 ("cook helper, pastry"), differs in only one digit from two unskilled jobs listed in the DOT. According to the DOT, a kitchen helper sweeps and mops floors, washes pots and pans by hand, transfers supplies and equipment by hand, and washes and peels vegetables with a knife or peeling machine. DOT 318.687-010. Similarly, a cook helper washes, peels, and cuts vegetables and fruits, and cleans, cuts, and grinds meats, poultry, and seafood. DOT 317.687-010. A cook helper also helps prepare and measure food items and ingredients, and stores foods in designated areas. *Id.*

Here, Petrie stated that his general job duties included making sandwiches and salads, cutting and preparing foods, opening and closing the "grill area," dishwashing, general custodial work, and unloading and stocking supplies. As Petrie's own submissions confirm that his previous work duties are substantially the same as the unskilled duties of a kitchen helper or a cook helper, we do not believe that the ALJ's determination was improper on this ground.

**D. Conclusion**

We have reviewed the parties' remaining arguments and find them to be moot or without merit. The judgment of the district court is therefore AFFIRMED.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

14