ELIZABETH A. WOLFORD, United States District Judge
INTRODUCTION
Represented by counsel, Plaintiff Michelle Marie Dunne ("Plaintiff") brings this *253 action pursuant to Titles II and XVI of the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner," or "Defendant") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Dkt. 1). This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 14; Dkt. 16). For the reasons discussed below, the Commissioner's motion (Dkt. 16) is granted and Plaintiff's motion (Dkt. 14) is denied.
BACKGROUND
Plaintiff protectively filed her application for DIB on December 8, 2013, and protectively filed her application for SSI on November 20, 2013. (Dkt. 8-2 at 25; Dkt. 8-3 at 28-29; Dkt. 8-5 at 2-11).[1] In her applications, Plaintiff alleged disability beginning October 15, 2012, due to: essential tremors; bipolar disorder ; post-traumatic stress disorder ; asthma ; diabetes ; alcoholism; high blood pressure ; and diverticulitis. (Dkt. 8-2 at 25; Dkt. 8-6 at 2, 8). Plaintiff's applications were initially denied on February 25, 2014. (Dkt. 8-2 at 25; Dkt. 8-4 at 2-9). At Plaintiff's request, a video hearing was held before administrative law judge ("ALJ") Joseph L. Brinkely in Alexandria, Virginia, on August 4, 2015. (Dkt. 8-2 at 25, 46-83). Plaintiff, represented by an attorney, appeared and testified in Elmira, New York. (Id. ). On August 28, 2015, the ALJ issued an unfavorable decision. (Dkt. 8-2 at 22-40). Plaintiff requested Appeals Council review; her request was denied on January 25, 2017, making the ALJ's determination the Commissioner's final decision. (Dkt. 8-2 at 2-4). This action followed.
LEGAL STANDARD
I. District Court Review
"In reviewing a final decision of the [Social Security Administration ("SSA") ], this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Talavera v. Astrue , 697 F.3d 145, 151 (2d Cir. 2012) (quotation omitted); see also 42 U.S.C. § 405(g). The Act holds that a decision by the Commissioner is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue , 569 F.3d 108, 112 (2d Cir. 2009) (quotation omitted). It is not the Court's function to "determine de novo whether [the claimant] is disabled." Schaal v. Apfel , 134 F.3d 496, 501 (2d Cir. 1998) (quotation omitted); see also Wagner v. Sec'y of Health & Human Servs. , 906 F.2d 856, 860 (2d Cir. 1990) (holding that review of the Secretary's decision is not de novo and that the Secretary's findings are conclusive if supported by substantial evidence). However, "[t]he deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart , 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler , 748 F.2d 109, 112 (2d Cir. 1984) ).
II. Disability Determination
An ALJ follows a five-step sequential evaluation to determine whether a claimant *254 is disabled within the meaning of the Act. See Parker v. City of New York , 476 U.S. 467, 470-71, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986). At step one, the ALJ determines whether the claimant is engaged in substantial gainful work activity. See 20 C.F.R. §§ 404.1520(b), 416.920(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, in that it imposes significant restrictions on the claimant's ability to perform basic work activities. Id. §§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the analysis concludes with a finding of "not disabled." If the claimant does have at least one severe impairment, the ALJ continues to step three.
At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). Id. §§ 404.1520(d), 416.920(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement (id. §§ 404.1509, 416.909), the claimant is disabled. If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or mental work activities on a sustained basis, notwithstanding limitations for the collective impairments. See id. §§ 404.1520(e), 416.920(e).
The ALJ then proceeds to step four and determines whether the claimant's RFC permits the claimant to perform the requirements of his or her past relevant work. Id. §§ 404.1520(f), 416.920(f). If the claimant can perform such requirements, then he or she is not disabled. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. Id. §§ 404.1520(g), 416.920(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of the claimant's age, education, and work experience. Rosa v. Callahan , 168 F.3d 72, 77 (2d Cir. 1999) (quotation omitted); see also 20 C.F.R. § 404.1560(c).
DISCUSSION
I. The ALJ's Decision
In determining whether Plaintiff was disabled, the ALJ applied the five-step sequential evaluation set forth in 20 C.F.R. §§ 404.1520 and 416.920. Initially, the ALJ determined that Plaintiff last met the insured status requirements of the Act on December 31, 2017. (Dkt. 8-2 at 27). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful work activity since October 15, 2012, the alleged onset date. (Id. ).
At step two, the ALJ found that Plaintiff suffered from the severe impairments of affective disorder, obesity, and essential tremors. (Id. at 27-28). The ALJ further found that Plaintiff's medically determinable impairments of diabetes, hypertension, and a history of alcohol abuse were non-severe. (Id. at 28).
At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any Listing. (Id. at 29). The ALJ particularly considered the criteria of Listings 11.00 and 12.04 in reaching his conclusion, as well as the effect of Plaintiff's obesity, as required by Social Security Ruling ("SSR") 02-1p. (Id. at 29-30).
*255 Before proceeding to step four, the ALJ determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that Plaintiff:
is limited to occasional stooping and climbing stairs and ramps; and occasional use of the upper extremities to push, pull, lift and reach overhead, bilaterally. However, [Plaintiff] is limited to frequent pulling, pushing, reaching and lifting in all other directions with the upper extremities and to frequent use of the upper extremities to finger, feel, grasp and handle, bilaterally. [Plaintiff] would need to avoid concentrated exposure to workplace hazards, such as dangerous machinery and unprotected heights, as well as respiratory irritants. [Plaintiff] would be limited to the types of low stress jobs that do not require her to complete a fixed number of high volume production quotas or fast-paced assembly line work. Further, she is limited to unskilled work, which is defined as no more than a svp-2 per the Dictionary of Occupational Titles, whereby she would retain the capacity to apply common sense understanding to carry out detailed, but uninvolved written and oral instructions. Additionally, [Plaintiff] is limited to frequent superficial interaction with the general public; can tolerate few or little changes in the work structure; retains the judgment to make simple work-related decisions independently; and would require unimpeded access to the restroom during normally scheduled breaks.
(Id. at 30-31). At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Id. at 38).
At step five, the ALJ relied on the testimony of a vocational expert ("VE") to conclude that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, including the representative occupations of photocopy machine operator, mail clerk, and cleaner/housekeeping. (Id. at 38-39). Accordingly, the ALJ found that Plaintiff was not disabled as defined in the Act. (Id. at 39-40).
II. The Commissioner's Determination is Supported by Substantial Evidence and Free from Legal Error
Plaintiff asks the Court to reverse or, in the alternative, remand this matter to the Commissioner, arguing that (1) the ALJ failed to properly analyze the opinion of Veena Garyali, M.D., Plaintiff's treating psychiatrist, and the opinions of Plaintiff's three treating neurologists, Leonid Segal, M.D., Sulada Kanchana, M.D., and Caren Douenias, M.D.; (2) the ALJ did not properly assess the RFC because he failed to consider Plaintiff's expected absences from work per month; and (3) the ALJ's evaluation of Plaintiff's tremors is not supported by substantial evidence. (Dkt. 14-1 at 17-25). The Court has considered each of these arguments and, for the reasons discussed below, finds them to be without merit.
A. Weighing of Treating Physician Opinions
Because Plaintiff's claims were filed before March 27, 2017, the ALJ was required to apply the treating physician rule, under which a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2). Under the treating physician rule, if the ALJ declines to afford controlling weight to a treating physician's medical opinion, he or *256 she "must consider various factors to determine how much weight to give to the opinion." Halloran v. Barnhart , 362 F.3d 28, 32 (2d Cir. 2004) (internal quotation marks omitted). These factors include:
(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.
Id. "An ALJ does not have to explicitly walk through these factors, so long as the Court can conclude that the ALJ applied the substance of the treating physician rule[.]" Scitney v. Colvin , 41 F.Supp.3d 289, 301 (W.D.N.Y. 2014) (internal quotation omitted).
Whatever weight the ALJ assigns to the treating physician's opinion, he must "give good reasons in [his] notice of determination or decision for the weight [he gives to the] treating source's medical opinion." 20 C.F.R. § 404.1527 (c)(2) ; see also Harris v. Colvin , 149 F.Supp.3d 435, 441 (W.D.N.Y. 2016) ("A corollary to the treating physician rule is the so-called 'good reasons rule,' which is based on the regulations specifying that 'the Commissioner "will always give good reasons' " for the weight given to a treating source opinion." (quoting Halloran , 362 F.3d at 32 ) ). "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific...." Harris , 149 F.Supp.3d at 441 (internal quotation marks omitted). The Second Circuit "[does] not hesitate to remand when the Commissioner's decision has not provided 'good reasons' for the weight given to a [treating physician's] opinion and [it] will continue remanding when [it] encounter[s] opinions from [ALJs] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran , 362 F.3d at 33.
1. Evaluation of Dr. Garyali's Assessments
Plaintiff began visiting Dr. Garyali in September 2011, after she was discharged from the Robert Packer Hospital, where she was treated for suicidal ideations. (Dkt. 8-7 at 393, 397). Dr. Garyali's psychiatric/mental status examinations of Plaintiff during the course of her treatment (2011-2014) were largely normal, including normal thought processes and associations; good memory; okay judgment and attention span/concentration; and no abnormal/psychotic thoughts. (Id. at 400-412). In some of her notes, Dr. Garyali noted that Plaintiff had some suicidal thoughts, but no intent or plan. (Id. at 412).
On January 22, 2014,[2] Dr. Garyali completed a medical summary letter. (Id. at 8-7 at 279-81). The medical summary recounts a history of Plaintiff's treatment and Plaintiff's own subjective complaints, but it does not include any information relating to Dr. Garyali's functional assessments of Plaintiff. (Id. at 279-80). In the letter, Dr. Garyali stated that the last time she saw Plaintiff was on November 21, 2013, when Plaintiff reported that she was doing "well," that she was addressing issues relating to her tremors, that her flashbacks were "much less," and that she recently drove to Canada for a music *257 event. (Id. at 281). Dr. Garyali diagnosed Plaintiff with several impairments, including dipolar disorder I, posttraumatic stress disorder, and alcohol abuse. (Id. ). Dr. Garyali further opined that Plaintiff:
[was] doing reasonably well. She has been working all along. In between when there is a flare-up, she acts very impulsively. Lately, she has been compliant with the medications and I think when she is stable on medications, she is able to function fairly well[.] The disability in my opinion is not a permanent disability and it can be fairly well controlled with medication, psychotherapy and regular psychiatric follow up.
(Id. ).
Three months later, on April 22, 2014, Dr. Garyali completed a second medical summary letter.[3] (Id. at 393-96). The medical summary recounts a history of Plaintiff's treatment and Plaintiff's own subjective complaints, but it does not include any information relating to Dr. Garyali's functional assessments of Plaintiff. (Id. at 393-95). The medical histories recounted in the January 22, 2014 letter and April 22, 2014 letter are similar, and the April 22, 2014 letter does not include any additional significant information relating to Plaintiff's functional capacity. A mental status examination revealed that Plaintiff's speech was "coherent and relevant"; there was no evidence of thought disorder, delusions or hallucinations; Plaintiff was alert, and her memory was intact; Plaintiff denied any suicidal or homicidal ideation; and her insight and judgment were "ok." (Id. at 395). Dr. Garyali assessed Plaintiff with several impairments, including bipolar disorder I, posttraumatic stress disorder, and alcohol abuse. (Id. ) In a marked contrast to her prior medical summary letter completed only three months earlier, Dr. Garyali opined that Plaintiff's "psychiatric condition seriously interferes with her functioning," and that she "cannot stand the stress of a regular job where she has to be at a certain place at a certain time and follow a routine." (Id. at 396). Dr. Garyali concluded that Plaintiff was "seriously disabled and will not be able to function in a regular job situation." (Id. ).
On August 29, 2014, Dr. Garyali completed a medical source statement relating to Plaintiff's mental residual functional capacity. (Id. at 392). The statement is a one-page, check box/fill-in-the-blank style form. (Id. ). Dr. Garyali assessed Plaintiff as "seriously limited, but not precluded" for the following work activities: maintain attention for a two hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; accept instructions and respond appropriately to criticism from supervisors; and deal with normal work stress. (Id. ). Dr. Garyali also opined that, on average, Plaintiff would be absent from work more than four days per month. (Id. ). There is no explanation as to why or how Dr. Garyali arrived at this conclusion.
The ALJ afforded Dr. Garyali's assessments "limited weight." (Dkt. 8-2 at 36). The ALJ explained that Dr. Garyali had treated Plaintiff since September 2011, and her opinions as to Plaintiff's limitations were not internally consistent with her *258 own findings. (Id. ). The ALJ pointed specifically to the marked conflict between the January 2014 medical summary and the April 2014 medical summary and August 2014 medical source statement, relating to Dr. Garyali's opinion as to whether Plaintiff was able to function in a work setting. (Id. at 36-37). The ALJ further noted that Dr. Garyali's later findings that Plaintiff was unable to function in a work setting were contrary to her most recent mental status examination, where Plaintiff presented as pleasant and cooperative, having intact memory, with no suicidal ideations. (Id. at 37; see also Dkt. 8-7 at 395).
The Court finds that the ALJ adequately set forth his reasons for assigning Dr. Garyali's assessments "limited weight." As explained above, the ALJ explained that Dr. Garyali's opinions relating to Plaintiff's disability were internally inconsistent with her own treatment notes and pointed specifically to conflicting medical summaries. See Domm v. Colvin , 579 F. App'x 27, 28 (2d Cir. 2014) (ALJ may discount the opinion of a treating physician when the opinion is internally inconsistent with his own treatment notes, other medical evidence in the record, and the plaintiff's testimony); see also Karlstrom v. Berryhill , No. 16-CV-00586F, 2018 WL 4784557, at *6, 2018 U.S. Dist. LEXIS 171996, at *20 (W.D.N.Y. Oct. 4, 2018) ("[t]reating physician opinions, however, are not determinative and, thus, are granted controlling weight only when they are not inconsistent with other controlling evidence"). The ALJ identified specific inconsistencies and set forth in detail the basis for his determinations. Based on this information, the ALJ's weighing of Dr. Garyali's opinion was reasonable and consistent with the medical evidence in the record.
Plaintiff argues that the ALJ did not consider the factors contained in the regulations before declining to afford Dr. Garyali's opinions controlling weight. (Dkt. 14-1 at 17). However, a review of the written determination reveals that this is not the case. The written determination contains a summary of the treatment relationship between Plaintiff and Dr. Garyali, including that Plaintiff began treating with Dr. Garyali in 2011, that Dr. Garyali treated Plaintiff for mental health issues, and that Dr. Garyali continued treating Plaintiff through 2014. (Id. at 34-35). The written determination also contains a detailed summary of some of the more significant parts of Dr. Garyali's treatment notes, including mental health assessments and Plaintiff's reported symptoms, and some reports of improvement. (Id. ). Finally, as further discussed above, the written determination discusses that Dr. Garyali's opinions relating to Plaintiff's disability were inconsistent with her own previous assessments. (Id. at 36-37). The ALJ's decision thus demonstrates compliance with the treating physician rule.
Plaintiff further argues that "if the ALJ had questions as to why Dr. Garyali issued a revised psychiatric summary, then the ALJ should have developed the record further by requesting information from Dr. Garyali concerning this issue." (Dkt. 14-1 at 20). This argument lacks merit. An ALJ has a duty to develop the record, particularly where there are "gaps in the record," or "when the record serves as an inadequate basis on which to render a decision." Grey v. Calvin , No. 14-CV-127S, 2015 U.S. Dist. LEXIS 42796, at *8 (W.D.N.Y. Mar 31, 2015). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Petrie v. Astrue , 412 F. App'x 401, 406 (2d Cir. 2011) (internal quotation marks omitted); see also *259 Reithel v. Comm'r of Soc. Sec. , No. 6:17-CV-06209 EAW, 330 F.Supp.3d 904, 912, 2018 WL 4445103, at *5, 2018 U.S. Dist. LEXIS 148531, at *15 (W.D.N.Y. Aug. 27, 2018) ("[T]he [ALJ] need only re-contact sources or obtain additional information where there is a conflict or ambiguity that must be resolved but that cannot be resolved based on the evidence present in the record.") (internal quotations and citation omitted). Plaintiff has not identified any gap or ambiguity in the record that could be solved by re-contacting Dr. Garyali. Despite the inconsistencies between the January 2014 and April 2014 medical summaries offered by Dr. Garyali, the ALJ had adequate evidence in the record from which he could properly and thoroughly assess Plaintiff's RFC, including opinion evidence from Look Persaud, M.D., a consultative examiner; opinion evidence from Sarah Long, Ph.D., a consultative examiner; a medical source statement by Nancy Erwin, N.P.P.; and the opinion of L. Blackwell, Ph.D., a state agency consultative examiner. (Dkt. 8-2 at 33-37). The ALJ also considered treatment notes provided by three neurologists, Drs. Segal, Kanchana, and Douenias, in formulating the RFC. (Id. at 33). In other words, there was abundant medical opinion evidence in the record from which the ALJ could and did assess Plaintiff's RFC. See Dougherty-Noteboom v. Berryhill , No. 17-CV-00243-HBS, 2018 WL 3866671, at *10, 2018 U.S. Dist. LEXIS 138097, at *35 (W.D.N.Y. Aug, 18, 2018) ("Given the five total medical opinions in the record that were obtained, and the plethora of treatment notes from all of plaintiff's physicians, there is no indication that there were 'obvious gaps' in the record that would have prompted the ALJ to seek additional evidence from plaintiff's primary care doctor").
2. Evaluation of Treatment Notes From Neurologists
Plaintiff also argues that the ALJ erred in evaluating opinions of three of Plaintiff's treating neurologists, including Drs. Segal, Kanchana, and Douenias, relating to work-related restrictions stemming from Plaintiff's tremors. (Dkt. 14-1 at 20). None of these doctors offered formal opinions on Plaintiff's work-related restrictions, a point Plaintiff concedes. (Id. ). Moreover, Plaintiff's characterization of these individuals as "treating physicians" is generous, considering that each of these providers saw Plaintiff on only one or two occasions. See Rivera v. Berryhill , No. 17-CV-991 (JLC), 2018 WL 4328203, at *9, 2018 U.S. Dist. LEXIS 154431, at *24 (S.D.N.Y. Sept. 11, 2018) ("The regulations define a treating physician as the claimant's own physician, psychologist, or other acceptable medical source who provides [the claimant] ... with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]") (internal quotations and citation omitted) (alterations in original); Kirkland v. Colvin , No. 15-CV-6002P, 2016 WL 850909, at *10, 2016 U.S. Dist. LEXIS 28071, at *32 (W.D.N.Y. Mar. 4, 2016) (collecting cases holding that a medical provider who has evaluated a patient on only a few occasions does not constitute a "treating physician").
However, even if Drs. Segal, Kanchana, and Douenias were considered treating physicians pursuant to the regulations, Plaintiff's statement that the ALJ did not consider their treatment of Plaintiff is incorrect. The ALJ thoroughly discussed Plaintiff's treatment relating to her tremor, including treatment by Drs. Segal, Kanchana, and Douenias, in the written determination. (Dkt. 8-2 at 33). Plaintiff's tremor was assessed as mild but exacerbated by anxiety or talking about the tremor. (Dkt. 8-7 at 286-93, 372-75, 424-27). While Plaintiff reported at her second visit with Dr. Segal on November 19, 2013 that *260 her tremors were "worsening" (id. at 290), at a more recent visit with Dr. Douenias on March 30, 2015, Plaintiff reported that she "ha[d] been learning some new coping skills and ha[d] been very active in looking for methods and tools to assist her in her condition." (Id. at 424). Dr. Douenias assessed a benign essential tremor, and because Plaintiff was "coping better with [her] diagnosis," did not make any changes to her medications. (Id. at 425). Based on these treatment notes, the ALJ concluded:
[t]he treatment notes support that [Plaintiff's] essential tremors limited her functional abilities. Though exacerbated by anxiety, clinical findings nonetheless support that her tremors persisted despite medication. However, as noted in her last evaluation [with Dr. Douenias], she was coping better with her diagnosis. Therefore, limitations for no more than occasional pulling, reaching lifting, and reaching overhead, with no more than frequent use of her upper extremities for such movements in all other directions is warranted. Additionally, due to the impact of her tremors on her fine motor skills, a limitation for no more than frequent use of both upper extremities to finger, feel, grasp and handle is also warranted.
(Dkt. 8-2 at 33). Accordingly, the written determination is very clear as to how the ALJ assessed Plaintiff's ability to use her upper extremities. The ALJ discussed and considered treatment for Plaintiff's tremor provided by Drs. Segal, Kanchana, and Douenias, and the ALJ's assessment of those records was reasonable, based on other evidence in the record.
Plaintiff argues that because Drs. Segal, Kanchana and Douenias all found that Plaintiff had a tremor, the ALJ should have afforded their treatment notes "great weight," and imposed "significant limitations on the plaintiff's ability to perform fine manipulation with her upper extremities." (Dkt. 14-1 at 21). Plaintiff's argument misses the mark. The ALJ agreed that the medical evidence, particularly the treatment records of Drs. Segal, Kanchana, and Douenias, revealed that Plaintiff had a tremor. See Dkt. 8-2 at 33 ("the treatment notes support that the claimant's essential tremors limited her functional abilities" and recognizing that Plaintiff's tremors are "exacerbated by anxiety"). However, as further discussed above, the ALJ also found that based on other evidence in the record, Plaintiff's tremors did not completely prevent her from performing any type of work. Simply because a claimant has an impairment, even when diagnosed by several medical sources, does not equate to an inability to work under the Act. See Oakes v. Comm'r of Soc. Sec. , No. 5:15-CV-1246 (GTS/WBC), 2017 WL 1032519, at *2, 2017 U.S. Dist. LEXIS 37452, at *7 (N.D.N.Y. Mar. 14, 2017) ("the standard for disability is not whether a claimant is completely free of symptoms but whether the claimant has symptoms so debilitating as to preclude any substantial gainful activity"). Here, the ALJ acknowledged that Plaintiff suffered from tremors but, based on medical evidence in the record, concluded that Plaintiff's tremors did not completely preclude her from performing light work with additional limitations.
Finally, Plaintiff makes a passing remark about the opinion of Dr. Persaud, whose opinion she claims "bolster[s] and support[s]" the notes of Drs. Segal, Kanchana, and Douenias. (Dkt. 14-1 at 21). Plaintiff does not make any specific argument as to the ALJ's treatment of Dr. Persaud's opinion; however, to the extent Plaintiff challenges the ALJ's assessment of Dr. Persaud's opinion, this argument also fails. Plaintiff underwent a consultative internal medicine examination with Dr. Persaud on December 19, 2013. ( *261 Dkt. 8-7 at 294-300). Plaintiff had a normal gait, did not use any assistive devices, and did not appear to be in acute distress. (Id. at 297). Plaintiff did not have any sensory deficit, and her strength was a "5/5" in her upper and lower extremities. (Id. at 299). Plaintiff's hands showed tremors, worse with activities and use, with hand and finger dexterity severely impaired bilaterally for all activities. (Id. ). Plaintiff's grip strength was rated at a "5/5" bilaterally. (Id. ). Dr. Persaud assessed Plaintiff with several impairments, including bilateral essential tremors, severe. (Id. ). Dr. Persaud opined that Plaintiff had mild restrictions for bending, twisting, and turning, and a marked restriction for fine motor skills of the hands, bilaterally. (Id. ). Dr. Persaud further opined that Plaintiff had a moderate to marked restriction for lifting, carrying, pushing, and pulling, due to her tremors. (Id. ).
The ALJ afforded Dr. Persaud's opinion "limited weight," based on the timing of his examination. (Dkt. 8-2 at 34). Specifically, the ALJ explained that Dr. Persaud's December 2013 evaluation of Plaintiff occurred shortly after she started treatment for the tremors, and more recent treatment records reflect that Plaintiff had a higher level of functioning than assessed by Dr. Persaud. (Id. ). The ALJ cited specifically to the March 2015 examination with Dr. Douenias, where Plaintiff reported that she was better coping with her diagnosis. (Id. ). See Jones v. Colvin , No. 6:14-cv-0616(MAT), 2015 WL 4628972, at *4-5, 2015 U.S. Dist. LEXIS 100981, at *11-12 (W.D.N.Y. Aug. 3, 2015) (indicating that ALJ should give more weight to a recent opinion, rather than to an outdated opinion). The ALJ also pointed to Plaintiff's testimony that she was able to perform tasks requiring a fine degree of motor control with her hands, including putting on her bra and watch, as well as driving. (Dkt. 8-2 at 34.). Based on this information, the Court finds that the ALJ did not err in assessing Dr. Persaud's opinion, considering his treatment relationship with Plaintiff; the timing of his examination; and other, more recent medical evidence in the record. Remand on this basis is not warranted.
B. The RFC Assessment
In deciding a disability claim, an ALJ is tasked with "weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." Matta v. Astrue , 508 F. App'x 53, 56 (2d Cir. 2013). An ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in his decision." Id. However, an ALJ is not a medical professional, and "is not qualified to assess a claimant's RFC on the basis of bare medical findings." Ortiz v. Colvin , 298 F.Supp.3d 581, 586 (W.D.N.Y. 2018) (quotation omitted). In other words:
An ALJ is prohibited from 'playing doctor' in the sense that 'an ALJ may not substitute his own judgment for competent medical opinion.... This rule is most often employed in the context of the RFC determination when the claimant argues either that the RFC is not supported by substantial evidence or that the ALJ has erred by failing to develop the record with a medical opinion on the RFC.
Quinto v. Berryhill , No. 3:17-cv-00024 (JCH), 2017 WL 6017931, at *12, 2017 U.S. Dist. LEXIS 200302, at *36-37 (D. Conn. Dec. 1, 2017) (citations omitted). "[A]s a result[,] an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." Dennis v. Colvin , 195 F.Supp.3d 469, 474 (W.D.N.Y. 2016) (quotation and citation omitted).
*262 1. Evaluation of Plaintiff's Expected Absences
Plaintiff argues that, in formulating the RFC determination, the ALJ erred in failing to consider evidence relating to the number of days Plaintiff would be absent from work. (Dkt. 14-1 at 22). Plaintiff points specifically to the opinions of Dr. Garyali and nurse practitioner Erwin (hereinafter, "N.P. Erwin"). As noted above, on August 29, 2014, Dr. Garyali completed a one-page medical source statement relating to Plaintiff's mental residual functional capacity. (Dkt. 8-7 at 392). The statement consists of a one-page, fill-in-the-blank document. (Id. ). On the form, Dr. Garyali checked the box indicating that, on average, Plaintiff would be absent from work more than four days per month. (Id. ). There is no explanation as to why or how Dr. Garyali arrived at this conclusion. Similarly, on February 26, 2015, N.P. Erwin, who saw Plaintiff for mental health treatment on three occasions between January and March 2015, completed the same, one page, fill-in-the-blank mental residual functional form. (Id. at 414). Nurse Erwin also checked the box that indicated that Plaintiff would be absent from work, on average, more than four days per month. (Id. ). N.P. Erwin's treatment notes are a part of the record and are nine pages in length. (Id. at 415- 23). The records summarize Plaintiff's history of mental illness, treatment with Dr. Garyali, and Plaintiff's subjective complaints. Mental status examinations performed on January 29, 2015, February 26, 2015, and March 18, 2015, were mostly normal. (Id. at 419, 421, 423). On January 29, 2015, Plaintiff exhibited "poor to fair" concentration, with some distractibility and confusion at times. (Id. at 419).
First, to the extent Plaintiff argues that the ALJ did not consider or discuss opinions relating to Plaintiff's absences from work, this statement is incorrect. The ALJ specifically noted Dr. Garyali's and N.P. Erwin's opinions relative to Plaintiff's expected absences in the written determination. (See Dkt. 8-2 at 36 ("Finally, Dr. Garyali indicated that the claimant would likely miss more than four days per month from work due to her impairments"); id. at 37 ("Ms. Erwin finally noted that the claimant would likely miss more than four days of work per month due to her impairments") ). As noted above at Section II(A), the ALJ did not err in affording limited weight to the conclusions of the August 29, 2014 assessment completed by Dr. Garyali, because those opinions conflicted with Dr. Garyali's own treatment notes and a recent, earlier opinion relating to Plaintiff's ability to work.
With regard to N.P. Erwin's opinion relating to Plaintiff's absences, the Court notes that nurse practitioners are not "acceptable medical sources," and their opinions are not entitled to any special weight. Young v. Berryhill , No. 17-CV-6199L, 2018 WL 2752443, at *1, 2018 U.S. Dist. LEXIS 96900, at *3 (W.D.N.Y. June 8, 2018). This is particularly true in this case, considering Plaintiff's and N.P. Erwin's limited treatment relationship. See Cowley v. Berryhill , 312 F.Supp.3d 381, 383 (W.D.N.Y. 2018) (explaining that amount of weight given to opinions of non-medical sources "is based, in part, on the examining and treatment relationship" and the "length and frequency of examinations...."). Nevertheless, the ALJ thoroughly discussed N.P. Erwin's February 26, 2015 assessment of Plaintiff and afforded the assessment "limited weight." (See Dkt. 8-2 at 37). The ALJ explained that N.P. Erwin "did not start treating [Plaintiff] until a month before she completed the medical source statement, and, therefore, she did not have the opportunity to develop an established treating relationship." (Id. ). The ALJ further noted that while Plaintiff demonstrated *263 minor limitations with memory and focus in her initial examination with N.P. Erwin, the limitations "seem[ed] to be more heavily based on the claimant's subjective allegations rather than the actual objective clinical findings." (Id. ). The ALJ's consideration of the lack of objective clinical findings was proper, as subjective complaints are insufficient to establish disability, particularly when they are not based on any objective medical evidence. See Poupore v. Astrue , 566 F.3d 303, 307 (2d Cir. 2009) (ALJ's finding that the plaintiff's subjective complaints of pain were insufficient to establish disability was supported by substantial evidence, where the plaintiff's "subjective complaints were unsupported by objective medical evidence....").
Further, Dr. Garyali's and N.P. Erwin's opinions relating to Plaintiff's expected absences are not particularly persuasive. Rather, both appear on a one-page, fill-in-the blank form, and are not accompanied by any explanation as to how or why Dr. Garyali or N.P. Erwin arrived at their conclusions. Accordingly, they were of little value to the ALJ on the issue of Plaintiff's expected absences. See Camille v. Colvin , 104 F.Supp.3d 329, 341 (W.D.N.Y. 2015) (opinions that are essentially "form reports composed of checklists and fill-in-the-blank statements," are "by their nature, of limited evidentiary value"), aff'd , 652 F. App'x 25 (2d Cir. 2016) ; see also Cowley , 312 F.Supp.3d at 383 (ALJ did not err in not fully crediting opinion of social worker, where social worker's opinion was "based on a brief treatment history," and "largely comprised of a series of check-box findings that were unsupported by an elaboration"). In sum, the Court finds that the ALJ did not err in his assessment of N.P. Erwin's opinions, considering her limited treatment relationship with Plaintiff and the nature of the evidence at issue. The ALJ therefore did not err in failing to include any limitations regarding expected absences in the RFC finding, contrary to Plaintiff's argument, and remand on this basis is not warranted.
2. Evaluation of Plaintiff's Tremors
Plaintiff's final argument is that the ALJ's evaluation of Plaintiff's tremors is not supported by substantial evidence. (Dkt. 14-1 at 23). In this regard, Plaintiff asks the Court to reverse and remand the decision of the Commissioner solely for the calculation of benefits. (Id. at 24).
In support of her argument, Plaintiff references the following: three of her treating neurologists have documented Plaintiff's tremors, and noted they increase with Plaintiff's anxiety; Plaintiff has been hospitalized over 18 times for mental health conditions; Plaintiff requires a specialized spoon to eat and a specialized pen to assist with writing; and Plaintiff's primary care provider assessed tremors in August and September 2013. (Id. at 23-24). Plaintiff also points to the opinion of Dr. Persaud. (Id. at 24).
Plaintiff's argument on this point is essentially a restatement of her argument that the ALJ did not properly evaluate the opinions of Drs. Segal, Kanchana, Douenias, and Perasud. As noted above, the ALJ evaluated the treatment records and opinion evidence in the record relating to Plaintiff's treatment for tremors. The objective medical evidence shows that Plaintiff has a mild baseline tremor that is exacerbated by anxiety. (See Dkt. 8-7 at 288 (Dr. Segal's examination revealed a "mild resting tremor"); id. at 292 (although Plaintiff reported that her tremors were getting worse, Dr. Segal assessed an "unchanged moderate degree of postural tremors," and "no resting tremors" during the exam); id. at 374 (exam by Dr. Kanchana revealed that Plaintiff's tremor fluctuates and is mild, but increases when *264 Plaintiff writes or talks about the tremor); id. (Dr. Kanchana assessed that Plaintiff's tremor "appears to be mild at baseline but is greatly exacerbated by anxiety") ). The ALJ provided good reasons for the extent to which he agreed with, or discounted, the opinions of Drs. Segal, Kanchana, Douenias, and Persaud. In particular, more recent records specific to treatment for Plaintiff's tremors revealed that she was "coping better with [her] diagnosis," and the neurologist did not make any changes to her medications (id. at 425), a point highlighted by the ALJ in the written determination (Dkt. 8-2 at 33-34).
Plaintiff testified extensively about her tremors and treatment for her tremors at the administrative hearing. (Id. at 56-61, 69-70). While Plaintiff has difficulty writing legibly and requires a special spoon to eat, she can drive, dress herself (including putting on her bra and watch) and do some cooking. (Id. at 69-70). The ALJ found that Plaintiff's ability to perform these activities demonstrates that she is able "to perform tasks that require a fine degree of motor control with her hands." (Id. at 34).
Based on the above-mentioned medical records, opinion evidence, and testimony, the ALJ concluded, "due to the impact of her tremors on her fine motor skills, a limitation for no more than frequent use of both upper extremities to finger, feel, grasp and handle is ... warranted." (Id. at 33). The ALJ also limited Plaintiff to low-stress, non-dangerous jobs, with limited to superficial interaction with the general public - all of which address Plaintiff's anxiety. The ALJ's conclusion that Plaintiff can use her upper extremities to finger, feel, grasp and handle from one-third to two-thirds of the time[4] is reasonable and supported by substantial evidence, particularly the medical records showing that Plaintiff was learning new coping skills for her tremor, and her own testimony relating to her day-to-day application of fine motor skills.
In deciding a disability claim, an ALJ is tasked with "weighting] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole" and the assessed RFC does not need to "perfectly correspond with any of the opinions of medical sources cited in his decision." Matta , 508 F. App'x at 56. The fact that there is conflicting evidence in the record relating to Plaintiff's ability to use her upper extremities does not invalidate the RFC finding, particularly where the ALJ identified the evidence and explained how he reached the assessed RFC. See Boltz v. Berryhill , No. 15-CV-00587-FPG, 2017 WL 999204, at *4, 2017 U.S. Dist. LEXIS 37109, at *10 (W.D.N.Y. Mar. 15, 2017) ("when reviewing the medical evidence, the ALJ has the authority to select among conflicting opinions") (quoting 20 C.F.R. § 404.1527(c) ); Vennor v. Colvin , No. 15-CV-6385-FPG, 2016 WL 3181171, at *6, 2016 U.S. Dist. LEXIS 72688, at *19-20 (W.D.N.Y. June 3, 2016) (finding that the ALJ properly resolved conflicting medical evidence where "[t]he ALJ reviewed and analyzed a great deal of medical evidence and considered findings that were favorable and unfavorable to [the plaintiff's] credibility and disability determination" and "provided extensive citations to medical evidence in the record to support her reasoning and conclusions"). Here, the medical evidence in the record as a whole, as well as Plaintiff's testimony, support the assessed RFC for Plaintiff's use of her upper extremities. Reversal on this basis is not warranted.
CONCLUSION
For the foregoing reasons, the Commissioner's motion for judgment on the pleadings *265 (Dkt. 16) is granted and Plaintiff's motion for judgment on the pleadings (Dkt. 14) is denied. The Clerk of Court is directed to enter judgment and close this case.
SO ORDERED.

When referencing the page number(s) of docket citations in this Decision and Order, the Court will cite to the CM/ECF-generated page numbers that appear in the upper righthand corner of each document.

The medical summary letter is dated January 22, 2013; however, the year listed appears to be a typographical error, because the letter itself refers to evaluations after January 22, 2013. The written determination indicates that the medical summary letter was completed on January 22, 2014. (Dkt. 8-2 at 35).

Dr. Garyali completed the second medical summary letter to address changes suggested by Plaintiff following Dr. Garyali's issuance of the January 22, 2014 letter, including some personal and historical details, and that contrary to Dr. Garyali's statement in the January 22, 2014 report that Plaintiff "has been working all along," that she had not worked since October 2012. (Dkt. 8-7 at 386-88).

SSR 85-15 defines "frequent use" as "from one-third to two-thirds of the time."